**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
HEALING FOR THE ABUSED WOMAN              :
MINISTRIES and KELWIN INKWEL, LLC,        :
on behalf of themselves and all others    :
similarly situated,                        :
                                           :
                    Plaintiffs,            :        CIVIL ACTION NO.
                                           :
v.                                         :        _____
                                           :
PNC MERCHANT SERVICES COMPANY, L.P., :              **Jury Trial Demanded**
                                           :
                    Defendant.             :
------------------------------------------------------------x
```

<u>**CLASS ACTION COMPLAINT**</u>

COME NOW Plaintiffs Healing for the Abused Woman Ministries and Kelwin Inkwel, LLC, individually and on behalf of the class of persons and entities preliminarily defined below, and complain and allege as follows, based on personal knowledge, investigation of counsel, and information and belief.

<u>**INTRODUCTION**</u>

1.    For years, PNC Merchant Services has engaged in a scheme through which it overbills its customers.  Indeed, once merchants are locked into long term contracts, Defendant assesses unanticipated and excessive fees.  Plaintiffs bring this action against Defendant for its breach of these contracts.

2.    In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  In order to accept this method of payment, the merchant must utilize a payment processing service.  As used throughout this Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments.  This includes non-profits,

schools, churches, government agencies, and many persons or entities that are not traditional businesses, such as Plaintiff Healing for the Abused Woman Ministries.  All are subject to the same improper treatment by Defendant.

3.    Merchants like Plaintiffs rely on companies like Defendant to provide this critical service in accordance with fair and transparent terms.  Indeed, for many merchants, fees for card processing services are likely to be the third highest expense following labor and product costs.  Even for a very small business, these fees can easily exceed $100 per month.

4.    The card processing system can be extremely difficult to understand, with many involved parties.  For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a).    The Card Issuer –  the company that issued the credit or debit card to the customer, which is typically a bank such as Chase, Bank of America, or Defendant's corporate affiliate PNC Bank, and which receives a fee whenever a customer uses one its cards for a transaction.  These companies receive fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction).  There are hundreds of different card types and the fee varies based on the type of card used.  For example, rewards credit cards command a higher fee than a card with no rewards program.  The fees paid to the issuing banks are generally known as "interchange fees."

(b).    The Card Network – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system.  The card networks charge additional per transaction fees, such as access fees.  By way of example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is

currently $0.0195 per credit card transaction and $0.0155 per debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is $0.195 per any card transaction.  The card networks also charge various additional fees depending on the merchant and type of transaction.  These additional fees are generally known as "assessments."  The fees established by the card networks (like the interchange fees) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is.  No entity aside from the card networks has the authority to modify these fees.

(c).   <u>The Payment Processor</u> – this is the entity that actually processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties.  First Data Merchant Services Corporation, which co-owns Defendant with PNC Financial Services Group, Inc., serves as payment processor for all of Defendant's customers.  In this way, more of the revenues and profits from customer transactions stay with Defendant and its owners than is often the case.

(d).   <u>The Member Bank</u> – only banks such as PNC Bank may be members of card networks.  These member banks "sponsor" payment processors so they may process transactions through the card networks.  Unsurprisingly, Defendant works with PNC Bank, N.A. as its member bank thus, once again, allowing more of the revenue earned from customers to stay under the PNC-First Data corporate umbrellas, and increasing group profits.

(e).   <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing

services and usually provide customer support to the merchant, such as sending monthly statements showing all credits and debits.  Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants.  The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants. Defendant is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well.  Once again, because customer revenues are shared among Defendant, PNC, and First Data, an inordinate amount of revenue and profit is kept "in house."

5.     The number of involved parties and moving pieces can make it difficult for merchants to understand what fees are assessed for each transaction and how they are calculated. Merchants thus rely on merchant acquirers to explain on the front end of their relationship exactly what fees will be charged.

6.     Unfortunately, some merchant acquirers exploit this position of power.  They induce merchants like Plaintiffs to execute standardized agreements that prominently disclose seemingly straightforward, transparent fees.  However, all the while, the merchant acquirer knows that the merchant is going to be flooded with additional fees that either were never disclosed in the standardized agreements or were concealed in the fine print and never brought to the merchant's attention.

7.     Defendant aggressively perpetrates this scheme.  Its standardized contracts intentionally misrepresent, omit, and/or conceal key facts concerning the fees it knows it will eventually charge merchants if they sign on the dotted line.

8.     Defendant knows full well that if merchants knew the true nature and extent of the fees they would eventually be charged, they would never agree to do business with Defendant.

9.      After inducing merchants to bind themselves to the standardized contract, Defendant then systematically crams merchants with fees that were either not disclosed in the agreement, were not sufficiently explained in the agreement, or violate the express terms of the agreement.   Moreover, Defendant formats its monthly statements to confuse and confound merchants and obscure its overcharges.

10.      This case challenges the nature and amount of the payment processing fees that Defendant imposes.

## PARTIES

11.     Plaintiff Healing for the Abused Woman Ministries does business as Abused Woman Ministries ("Abused Woman Ministries") and is a Florida-based ministry focusing on spiritual guidance and counseling for abused women.   Dr. Dorothy Hooks is its leader.   She speaks and publishes on the topic of all forms of domestic abuse.   She has written books such as *Unholy Matrimony: Healing for the Abused Woman*.   She founded The Lula McGrady Foundation, a Christianity-based nonprofit organization.

12.     Plaintiff Kelwin Inkwel, LLC ("Inkwel LLC") is a small business which exists to sell the works of art produced by its owner.   It was started in Maryland in 2015.   Inkwel LLC has no office and no employees.

13.     Defendant PNC Merchant Services Company, L.P. ("Merchant Services") is a Delaware limited partnership that is co-owned by PNC Bank, N.A. and First Data Merchant Services Corporation, which is a wholly-owned subsidiary of First Data Corporation.   First Data is the country's largest payment processor.   Defendant was formed in 1996 and has been incredibly successful for its two partners.

14.     Merchant Services did not grow rapidly until 2005.  After nine years of operation, the company had only 25,000 customers.  In 2005, the decision was made to make Merchant Services a bigger sales focus at PNC Bank.  The Bank bought an additional 20 percent of the company from First Data, taking the ownership percentages from 60 percent for First Data and 40 percent for PNC to 60 percent for PNC Bank and 40 percent for First Data.  The Bank was reorganized to make Merchant Services "a core product offering."

15.      The number of accounts grew rapidly thereafter.  Merchant Services went from having a shrinking number of clients in 2005 to growing at over 20 percent per year in 2008-2012.  The customer count went from 25,000 to over 100,000 by 2013.  Growth has continued under the aggressive sales practices, pushing the current customer count to over 150,000.

16.     The current President of Merchant Services, David Shorten, was National Sales Director for First Data before moving to PNC Merchant Services in 2004.  He then became the head of sales at Merchant Services and led the push to grow the company.  He is now the President and CEO at Merchant Services.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than New York.

18.     Oddly, Defendant is not registered to do business in New York even though it contractually mandates that all disputes against it be pursued in New York courts.  This Court still has personal jurisdiction over Defendant, however, because it has engaged in a continuous

and systematic course of doing business in New York by offering and providing payment processing services to thousands of New York citizens and companies.

19.     Venue lies within this judicial district because Merchant Services mandates that suits against it be filed in Suffolk County, which falls entirely within this district.

## INDIVIDUAL FACTUAL ALLEGATIONS

20.     Plaintiffs are former payment processing customers of Defendant.

**A.      Abused Woman Ministries**

21.     Plaintiff Abused Woman Ministries and its leader Dr. Hooks banked with PNC Bank.  In September of 2014, as a result of Defendant's cross-marketing with PNC Bank, Dr. Hooks contacted Merchant Services to inquire about payment processing services.  Dr. Hooks told the representative that she did not often need to process card transactions, but that she occasionally needed to accept credit or debit cards as payment for the purchase of her books.

22.     Dr. Hooks explained that in most months she would not be processing any transactions and, therefore, that she could not be subject to any monthly minimum fees.  The agent agreed and sent Dr. Hooks paperwork to sign.

23.     Dr. Hooks noticed some inaccurate information on the forms, such as that the anticipated transaction volume was much too high.  The agent stated that the inaccurate information was "just standard."

24.     PNC honored the agreed-upon terms until 2016 but then began to charge Dr. Hooks a monthly fee of $19.50 even when she did not process any transactions.  Dr. Hooks did not receive any notice of the new fee but luckily spotted it on one of her bank statements.

25.     Dr. Hooks contacted the manager of her PNC Bank branch and requested that the fees be stopped.  The branch manager put her in touch with personnel at Defendant.

26.     The Merchant Services representative refused to stop the charges or to reimburse Dr. Hooks.  He stated that if she wanted to leave PNC she would have to pay hundreds of dollars as an early termination fee, since she had entered a three-year agreement.  Dr. Hooks had never been told that it was a three-year deal or that any termination fees would apply.  Of course, since Merchant Services had agreed that she would have no monthly minimum fee, such terms would not have been a major financial concern anyway.  Only when Defendant imposed the new fee did the term and early termination fee become a threat to Abused Woman Ministries.

27.     Dr. Hooks complained to federal and state authorities and the Better Business Bureau but did not receive any satisfaction.

28.     PNC then charged her account a new and unannounced annual fee of $109.95.

29.     Dr. Hooks knew that Merchant Services would offer no relief so she complained directly to the branch manager at PNC Bank.  After making substantial efforts, the branch manager was able to obtain a refund from Merchant Services for some of the improper fees.  Also, he was able to obtain a termination of her account without penalty.

**B.    Kelwin Inkwel, LLC**

30.     The owner of Kelwin Inkwel had a personal account with PNC Bank.  In October of 2015, when he decided to open a business to sell his art works, he went to PNC Bank to open a business checking account.

31.     He asked about accepting credit cards and was told to contact Merchant Services.

32.     He told the Merchant Services agent that sales would be low and erratic since it was an unknown start-up business.  The agent agreed to sign Kelwin Inkwel up for a program that would be appropriate for such a business.

33.     Plaintiff never activated the account and never processed a single transaction with Merchant Services.  Nevertheless, Defendant began to debit approximately $80 per month from Plaintiff's account.  Even if the account had been activated, such fees exceeded those that had been agreed upon.

34.      Kelwin Inkwel received a letter dated May 6, 2016, which stated:

> As of today, you have not activated your account and we have not received any credit card transactions from your establishment.  We would like to ensure that you have every opportunity to realize the benefits of PNC Merchant Services' credit card processing.
>
> If you are still interested in accepting credit cards, please contact us as soon as possible.  You can call our Account Specialist area at **1-800-742-5030** within the next fifteen (15) days to complete your implementation process or to extend the timeframe.
>
> Unfortunately, if you do not contact us within that timeframe, the Agreement will be terminated due to non-activity effective thirty (30) days from the date of this letter, and all applicable termination fees will apply.

35.     Mr. Warren called Merchant Services and told the representative that he was never told he would be stuck in a long-term deal subject to early termination fees.  Defendant's representative informed Mr. Warren that Kelwin Inkwel would have to pay a termination fee of several hundred dollars.  Thus, even though Kelwin Inkwel had never even completed its account registration, and had already paid Defendant roughly $500 for nothing, Merchant Services still insisted it was owed hundreds of additional dollars.

36.     Kelwin Inkwel could not afford to pay the termination fee.  Nevertheless, Defendant seized all of the remaining funds from Plaintiff's business account and the account was closed by PNC Bank.

37.     As a consequence of Defendant's improper policies and practices, Plaintiffs have been wrongfully forced to pay unauthorized fees and charges.  Defendant has improperly

deprived Plaintiffs and those similarly situated of significant funds, causing ascertainable monetary losses and damages.

38.     The improper fees and charges described herein are illustrative only and are not intended to provide a full listing of the improper fees paid by Plaintiffs or the members of the proposed class.  Indeed, for customers that ran payment card transactions, Merchant Services assessed a variety of different but equally improper fees.

## CLASS ALLEGATIONS

39.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.

40.     The Class is preliminarily defined as:

> All United States customers of PNC Merchant Services that paid a fee not authorized in their merchant agreement.

41.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.  It is very likely that additional classes or subclasses will be appropriate.

42.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

43.     The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein. All of Defendant's contracts mandate that New York law be applied.  New York imposes a six-year statute of limitations on breach of contract actions.  Thus, if New York law is deemed to

apply, the relevant class period is likely to begin in October 2011 and extend through Defendant's change in conduct or the conclusion of the case.

44.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

45.     **Numerosity.**  The members of the Class are so numerous that individual joinder of all the members is impracticable.  There are hundreds of thousands of merchants that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

46.     **Commonality and Predominance.**  Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members.  Such questions include, but are not limited to:

        (a).     Whether Defendant acted and continues to violate its contract with merchants by assessing improper fees;

        (b).     Whether, to the extent Defendant's overcharges do not violate express provisions of the merchant agreement, they violate the covenant of good faith and fair dealing;

        (c).     Whether Defendant is liable to Plaintiffs and the other Class members for imposing improper fees on merchants for Defendant's own benefit;

(d).     Whether certain contractual provisions in Defendant's merchant agreement are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(e).     The proper method or methods by which to measure damages and/or restitution; and

(f).     Whether Defendant should be enjoined from engaging in any or all of the improper practices complained of herein.

47.     Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

48.     **Typicality.**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiffs and members of the Class were comparably injured through the uniform misconduct described above.

49.     **Adequacy of Representation.**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

50.     **Declaratory and Injunctive Relief.**  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant

continues to knowingly overbill the Class and utilize unenforceable contractual provisions in order to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

51.    **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CLAIM FOR RELIEF**

**COUNT ONE**
**Breach of Contract and Breach of the**
**Covenant of Good Faith and Fair Dealing**

52.    Plaintiffs repeat paragraphs 1 through 51 above.

53.    The actions taken by Defendant have materially violated the specific terms of its form merchant agreement.

54.    Further, Defendant has breached the contract by violating the covenant of good faith and fair dealing.  Defendant is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

55.     Defendant violated the contract by assessing charges not provided for and by unilaterally marking up agreed-upon fees and charges without proper basis.  Furthermore, Defendant has assessed other fees in the guise of pass-through fees from the card networks which are actually retained by Defendant.  Thus, Defendant has materially breached the express terms of its own form contract.

56.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts.

57.     Plaintiffs and the Class sustained damages as a result of Defendant's breaches of contract.

58.     New York law imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

59.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

60.     By charging fees that are inconsistent with those laid out in the contract including, but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, Defendant has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if Defendant believed that it had given itself

contractual discretion to increase mark-ups and fees, or add new fees, such discretion is constrained by good faith and fair dealing and Defendant's actions do not comport with this duty.

61.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no legitimate excuse or defense for Defendant's conduct.

62.     Defendant's anticipated attempts to defend its overbilling through reliance on contractual provisions will be without merit.  Such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons.  These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Class from recovering for such breaches.

63.     Plaintiffs and members of the Class sustained damages as a result of Defendant's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Class demand a jury trial on all claims so triable and judgment as follows:

1.     Certifying this case as a class action pursuant to Federal Rule 23;

2.     Temporarily and permanently enjoining Defendant from continuing the improper practices alleged herein;

3.     Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

4.     Awarding damages in an amount to be determined by a jury;

5.     Awarding pre-judgment interest at the maximum rate permitted; and

6.     Awarding such other relief as this Court deems just and proper.

DATED this 26th day of October, 2017.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb*
 Georgia Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

*Attorneys for Plaintiffs*

* Motion for *Pro Hac Vice* Admission to be filed
after case number assigned