**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

HEALING FOR THE ABUSED WOMAN    :
MINISTRIES, KELWIN INKWEL, LLC,    :
ANITA'S SKIN & BODY CARE, and    :
D.B. KOSIE & ASSOCIATES, on behalf of    :
themselves and all others similarly situated,    :
   :
          Plaintiffs,    :    CIVIL ACTION NO.
   :
v.    :    1:17-cv-06255-NGG-CLP
   :
PNC MERCHANT SERVICES COMPANY, L.P., :    **Jury Trial Demanded**
   :
          Defendant.    :

-----------------------------------------------------------x

## FIRST AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs Healing for the Abused Woman Ministries, Kelwin Inkwel, LLC, Anita's Skin & Body Care, and D.B. Kosie & Associates, individually and on behalf of the classes of persons and entities preliminarily defined below, and file this their First Amended Class Action Complaint, based on personal knowledge, investigation of counsel, and information and belief. The Court authorized this filing by order found at Docket Number 11.

## INTRODUCTION

1. For years, PNC Merchant Services Company, L.P. ("Defendant" or "Merchant Services") and its affiliates have engaged in a scheme through which it overbills its customers. Indeed, once merchants are locked into long-term contracts, Defendant assesses unanticipated and excessive fees and deliberately obscures and hides the upcharges so that merchants cannot reasonably detect that they have been overbilled.

2. Much of the harm is initially attributable to deception by Defendant's sales agents during the contracting process. These sales agents, with the full knowledge and encouragement of Defendant's management, seek to enroll merchants by every trick in the book, including by

failing to disclose fee practices they know will occur and outright lying about fine print contractual terms. Agents earn substantial commission income and bonuses by doing so.

3. Once merchants are enrolled, Defendant endeavors to cover up such frauds by blocking merchants from receiving itemized monthly statements. This practice has two effects: it obscures Defendant's upcharges and blocks merchants from complaining.

4. Those "squeaky wheel" merchants that are vigilant enough to demand itemized monthly statements and discover Defendant's scheme are typically unable to obtain any relief. Defendant instructs its sales agents and customer service department to refuse refunds in most cases. Merchants that refuse to accept the overbilling and seek to cancel are forced to pay excessive early termination penalties that often exceed amounts they would otherwise pay if they fulfilled the remaining months on their contract's term. Merchants are thus put to a Hobson's Choice – accept the overbilling or cancel and pay massive termination fees.

5. These allegations are not based on speculation but have been prepared following a thorough investigation of counsel, including conversations with many of Defendant's victims, several industry experts, and multiple former employees of Defendant.

6. Plaintiffs bring this action against Defendant for engaging in this scheme and the resulting breaches of contract and applicable New York law.

**THE PAYMENT PROCESSING INDUSTRY**

7. In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace. In order to accept this method of payment, the merchant must utilize a payment processing service. As used throughout this First Amended Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments. This includes

non-profits, schools, churches, government agencies, and many persons or entities that are not traditional businesses, such as Plaintiff Healing for the Abused Woman Ministries. All are subject to the same improper treatment by Defendant.

8. Merchants like Plaintiffs rely on companies like Defendant to provide the critical payment processing service in accordance with fair and transparent terms. Indeed, for many merchants, fees for card processing services are likely to be the third highest expense following labor and product costs. Even for a very small business, these fees can easily exceed $100 per month. Merchants on average effectively pay 2-3% of card transaction revenue to the various participants in the payment processing industry. As described below, merchants are promised such rates by Defendant but often end up paying double that rate or more based on improper practices.

9. The card processing system can be extremely difficult to understand, with many involved parties. For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a). <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase, Bank of America, or Defendant's corporate affiliate PNC Bank, and which receives a fee whenever a customer uses one its cards for a transaction. These companies receive fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). There are hundreds of different card types and the fee varies based on the type of card used. For example, rewards credit cards command a higher fee than a card with no rewards program. The fees paid to the issuing banks are generally known as "interchange fees." Because the card issuers must be

members of the Visa, MasterCard, and Discover payment networks – which set interchange rates for each card type and require all member banks to adhere to them – the interchange rates charged by each card issuer is the same.

(b).    The Card Network – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system. The card networks charge additional per transaction fees, such as access fees.  By way of example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is currently $0.0195 per credit card transaction and $0.0155 per debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is $0.195 per any card transaction.  The card networks also charge various additional fees depending on the merchant and type of transaction.  These additional fees are generally known as "assessments."  The fees established by the card networks (like the interchange fees) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is.  No entity aside from the card networks has the authority to modify these fees.

(c).    The Payment Processor – this is the entity that actually processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties.  First Data Merchant Services Corporation ("First Data"), which co-owns Defendant with PNC Bank, N.A. ("PNC Bank"), serves as payment processor for all of Defendant's customers.  In this way, more of the revenues and profits from customer transactions stay with Defendant and its owners than is often the case.

(d).    The Member Bank – only banks such as PNC Bank may be members of card networks.  These member banks "sponsor" payment processors so they may process transactions through the card networks.  Unsurprisingly, Defendant works with PNC Bank as its member bank thus, once again, allowing more of the revenue earned from customers to stay under the PNC-First Data corporate umbrellas, and increasing group profits.

(e).    The Merchant Acquirer – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and often provide customer support.  Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants.  The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants.  Defendant is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well.  Once again, because customer revenues are shared among Defendant, PNC, and First Data, an inordinate amount of revenue and profit is kept "in house."

10.    The number of involved parties and moving pieces can make it difficult for merchants to understand what fees are assessed for each transaction and how they are calculated.  Merchants thus rely on merchant acquirers to explain on the front end of their relationship exactly what fees will be charged and to provide detailed itemized statements showing the fees that are charged.

11.    Unfortunately, some merchant acquirers exploit this position of power.  They induce merchants like Plaintiffs to execute standardized agreements that prominently disclose fees that have been discussed and agreed-upon.  However, all the while, the merchant acquirer

knows that the merchant is going to be flooded with additional fees that either were never disclosed in the standardized agreements or were concealed in the fine print and never brought to the merchant's attention.

12. Defendant employs aggressive sales tactics to institute just such a scheme. Defendant knows full well that if its agents disclosed its true practices – including that Defendant will (a) add fees or mark-up existing fees without notice and in bad faith, (b) manipulate transactions to place them into higher fee categories than warranted, (c) attempt to prevent merchants from discovering its overbilling, (d) refuse to provide refunds of improper fees, and (e) force merchants to pay more to terminate than stay in the deal – merchants would never agree to do business with Defendant.

13. This case challenges the nature and amount of the fees that Defendant imposes on its customers in the below-defined classes and seeks monetary damages, restitution, declaratory relief, and injunctive relief.

## PARTIES

14. Plaintiff Healing for the Abused Woman Ministries does business as Abused Woman Ministries ("Abused Woman Ministries") and is a Florida-based ministry focusing on spiritual guidance and counseling for abused women. Dr. Dorothy Hooks is its leader. She speaks and publishes on the topic of all forms of domestic abuse. She has written books such as *Unholy Matrimony: Healing for the Abused Woman*. She founded The Lula McGrady Foundation, a Christianity-based nonprofit organization. Abused Woman Ministries was signed-up with Defendant from September 2014 until late 2016.

15. Plaintiff Kelwin Inkwel, LLC ("Inkwel LLC") is a small business which exists to sell the works of art produced by its owner, Kelwin Warren. It was started in Maryland in 2015.

Inkwel LLC has no office and no employees. Inkwell LLC retained Defendant to provide processing services in October 2015, but its business never got off the ground and it never processed a single payment through Defendant.

16.     Plaintiff Anita's Skin & Body Care ("Anita's") is a small business located in Florida. Anita's has offered skincare therapy and products since 2006 and was a customer of Defendant from September 2012 through December 2015.

17.     Plaintiff D.B. Kosie & Associates ("Kosie") is a family-owned-and-operated business providing land surveying services in Ohio since 1966. Kosie offers services ranging from property line identification to trail mapping. Kosie was a customer of Defendant from May 2015 through April 2017.

18.     Defendant Merchant Services is a Delaware limited partnership that is co-owned by PNC Bank and First Data, which is a wholly-owned subsidiary of First Data Corporation. PNC Bank is the sixth largest retail bank in the United States, with over $370 billion in assets. First Data is the country's largest payment processor. Defendant was formed in 1996 and has been incredibly successful for its two partners.

19.     Merchant Services did not grow rapidly until 2005. After nine years of operation, the company had only 25,000 customers. In 2005, the decision was made to make Merchant Services a bigger sales focus at PNC Bank. The Bank bought an additional 20 percent of the company from First Data, taking the ownership percentages from 60 percent for First Data and 40 percent for PNC to 60 percent for PNC Bank and 40 percent for First Data. The Bank was reorganized to make Merchant Services "a core product offering."

20.     The number of accounts grew rapidly thereafter. Merchant Services went from having a shrinking number of clients in 2005 to growing at over 20 percent per year in 2008-

2012. The customer count went from 25,000 to over 100,000 by 2013. Growth has continued under the aggressive sales practices described herein, pushing more recent customer accounts to over 125,000 merchants.

21. The current President of Merchant Services, David Shorten, was National Sales Director for First Data before moving to PNC Merchant Services in 2004. He then became the head of sales at Merchant Services and led the push to grow the company. He is now the President and CEO at Merchant Services.

## JURISDICTION AND VENUE

22. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than New York.

23. Oddly, Defendant is not registered to do business in New York even though it contractually mandates that all disputes against it be pursued in New York courts. This Court still has personal jurisdiction over Defendant, however, because it has engaged in a continuous and systematic course of doing business in New York by offering and providing payment processing services to thousands of New York citizens and companies.

24. Venue lies within this judicial district because Merchant Services mandates that suits against it be filed in Suffolk County, which falls entirely within this district.

## COMMON FACTUAL ALLEGATIONS

**A.** **Defendant's High Sales Goals and Inadequate Training Methods Breed Deception.**

25. Defendant obtains merchant customers through its sales team, which is divided into inside sales and outside sales. The inside sales team consists of sales agents that field sales

leads produced by PNC Bank. For example, tellers are incentivized to mention to business customers of the Bank that they should consider using Merchant Services for their payment processing. If the business owner or manager expresses interest, their contact information is provided to an inside sales agent, who contacts them by phone and/or email in an effort to make the sale. Inside sales agents do not make in-person visits to businesses or branches of the Bank. Inside sales agents are paid employees. They receive a modest base salary and commissions if they achieved sales goals.

26. Inside sales agents have three goals. The first is to sell a specified number of "units" per month. A "unit" is defined as a new merchant account. For years, this goal was 12 units per month. It was reduced in 2017 to 10 units for month for reasons discussed below.

27. The second is for the agent's "units" to produce at least $125,000 in annual net revenue. In other words, the annual net revenue that Defendant receives from the agent's merchants (i.e., all fees charged minus pass through fees that must be paid to the card issuers and card networks) must exceed $125,000.

28. The third goal is that the agent must attain a "Quality Score" of 4.2 out of a possible 5.0. While the first two goals impacted the inside sales agent's commission revenue, this third goal did not. An agent's Quality Score is calculated by an employee named Susan King based on her review of two sales calls made by inside agents to prospective merchants in a given month. These calls were chosen at random.

29. Ms. King would listen to a call and rate it on a scale of 1.0 (poor) to 5.0 (excellent). Calls were *not* rated based on the accuracy of the sales agent's communications to prospective merchants. Indeed, Ms. King has no background in how the payment processing industry actually works, fees are calculated, etc., so she has no foundation to know whether sales

agents were misrepresenting facts to prospective customers.  Instead, Ms. King calculated an agent's Quality Score based on factors such as "being nice to the customer."  Thus, agents could omit key facts about fees or outright lie about terms, but so long as they were nice to the customer, they could receive high Quality Scores.

30.     Once a month, Ms. King would have a "Call Listening Session" with inside sales agents where she played what she believed to be an exemplary sales call that achieved a 5.0 score.  Often, these calls were characterized by agents making a sale by withholding key information from the customer.  Inside sales agents joke about how the best way to maintain a high Quality Score is to omit pertinent information (thereby cheating the customer) but do so in a "nice" way.

31.     High Quality Scores kept agents in the good graces of their superiors but did not directly affect commission income.  Rather, an agent's commission was calculated by a combination of the first two goals, number of units sold and annual revenue, with the unit goal being far and away most important.  Agents that sold the most units (often in excess of 40) were lauded by superiors on sales calls despite knowing full well that agents could not possibly make that many sales without taking short cuts.

32.     Until 2017, sales agents attained "Master's Club" status and were eligible for commission income if they met their 12 unit per month sales goal.  If this goal was not met, agents were not eligible for any Master's Club commission, regardless of whether they sold 11 units or were on pace to meet their annual revenue goal.

33.     Agents that did meet the 12 unit goal were eligible for a commission bonus of $115 per unit.  But the amount of the commission depended on whether the agent was on pace to meet his or her annual revenue goal.  For instance, if an agent sold 12 units and was at 80% or

more of the annual revenue goal, he or she received the full $115 per unit commission. However, if the agent was not on pace for at least 80% of the annual revenue goal, he or she received a commission of less than $115 per unit, depending on the annual revenue status.

34.    Thus, the most important factor for inside sales agents to earn Master's Club commissions was to sign up as many new accounts as possible.  Managers were constantly reminding inside sales agent teams of how many units they had sold in a given month and encouraging them to sell more.  One former sales agent said: "management just wanted to get as many units coming in as possible, it didn't matter if they were even profitable because they knew they were going to get screwed later on down the road."

35.    In 2017, Defendant modified its Master's Club eligibility requirements. Defendant did so strictly for liability reasons in response to the Wells Fargo fake account scandal.  Defendant was concerned that if it kept commission revenue inextricably tied to the number of new accounts, it could face a similar lawsuit.  One former agent said: "they told us the reason was that Wells Fargo was busted for aggressive sales and they wanted to make it look like we were not only going for units even though it was still all about the units."

36.    Defendant, however, made no effort to notify customers that had been signed up based on this program and it did not agree to waive termination fees for such merchants.

37.    As a result of the Wells Fargo scandal, Defendant reduced the unit goal to 10 and allowed agents to make a very small amount of commission revenue even if they did not meet this goal and qualify for Master's Club.  However, this had little effect on agent activities because agents could not make a decent living without qualifying for Master's Club.

38.    Master's Club was not the only way for sales agents to qualify for commission income.  Agents were also eligible to keep half of certain "start-up fees" they convinced

merchants to pay at the outset of a relationship (such as a $175.00 "Application Fee," a $195.00 "Programming Fee," etc.). These fees are "hard-coded" on the form applications and must be crossed out by agents. As a result, it was only natural that agents tried to convince merchants to pay these bogus fees, which were not necessary and were not designed to cover any real costs. As described further below, in order to convince merchants to accept the fees, agents often promised that they would be automatically refunded after the first transaction was processed. These promises were not true. Such refunds never appeared unless merchants spent hours on the phone and were able to convince someone with authority at Merchant Services or PNC Bank that they would not take no for an answer, a very rare occurrence.

39.     The calls of inside sales agents are recorded and saved. However, these calls are not monitored by management for any reason other than the Quality Score inquiry, which does not account for deceptive sales tactics. The only way an inside sales agent could get caught lying about a fee or contract term on a recorded line is if the merchant discovered it had been duped and complained. Even in situations where this occurred, the agent was not reprimanded, rather the merchant was appeased by Defendant through refunds or allowing termination without penalty. Again, Defendant did not want to discourage agents from selling as many units as possible.

40.     In addition to sales goals, Defendant fostered its culture of deception by providing new sales agents with inadequate training methods. The official "training" is only a week long and not very in depth. New agents are taken by management to a sporting event and are told how they can earn commission revenue.

41.     However, before new agents are released to sell on their own, they "shadow" high earning sales agents for a period of six months. This is where the real training takes place. New

agents are taught that the only way to make any money is to sell more units and quickly learn the best deceitful tricks to do just that (*see*, ¶¶ 44-58, *infra*). This "shadow" training is the equivalent of going to prison and learning to become a better criminal.

42. Defendant also uses outside sales agents, who work primarily at PNC Bank branches to directly interact with potential customers. Outside sales agents will also travel to potential customers' places of business. Outside sales agents are paid a higher base salary and commissions than inside sales agents and are subjected to similar goals and incentives as inside sales agents. However, because of their ongoing relationship with some customers, they also receive residual payments based on some of the ongoing fees Defendant charges on accounts that they signed up.

43. The calls of outside sales agents are not recorded. It is commonly known by Defendant's officers and employees that outside sales agents can and often do say anything to close a deal. Inside sales agents often complain to management about outside agents "stealing" their sales.

**B.** **Agents Do Whatever Is Necessary to Close the Deal.**

44. The inadequate training and pressure to open accounts has led to a variety of reprehensible sales tactics, described below. These tactics are all well known to, and endorsed by, Defendant's upper management, including but not limited to Dave Shorten, Norman Haug, and Patty McQuade.

45. Sales agents pitch the benefits of Defendant's services with prospective merchants and discuss pricing. If merchants express any interest at all, the agents ask the customer to sign an "Application," telling the customer it is a necessary step to determining whether it is eligible to do business with Defendant and that if the merchant is approved, the agent will be back in

touch to finalize the deal. This is a bold-faced lie because, once the merchant signs the "Application," the deal has already been finalized. The "Application" is actually a binding contract and the merchant is stuck doing business with Defendant for a three-year term if it is approved (which virtually all merchants are).

46. Sales agents do not provide merchants with the fine print terms and conditions governing the parties' relationship before an Application is signed, except on rare occasions. Most of these terms are memorialized in separate documents, including those known as "the Program Guide" and "the Interchange Qualification Matrix." Combined, these documents often approach **150 pages in length**. A sample Program Guide and Interchange Qualification Matrix are attached hereto as Exhibits A and B.[1] These documents are contracts of adhesion drafted by Defendant and offered on a take it or leave it basis.

47. If merchants were provided these documents and told that Defendant considered them to binding legal terms, merchants might be scared off because of the length, dense legal text, and use of industry jargon. For this reason, sales agents intentionally fail to provide these documents to prospective merchants. The agents know that the fine print of the Application contains a section indicating that the merchant acknowledges receipt of the documents, so even if the agent fails to provide them, the merchant has (falsely) affirmed that they received them and are stuck with their provisions. Thus, agents often enroll merchants in contracts without providing them the vast majority of terms that govern the contracts, all of which are, of course,

---

[1] These are the Program Guide and Interchange Qualification Matrix which Defendant claimed governed Abused Woman Ministries' account after disputes developed. *See* ¶¶ 106-114, *infra*. Dr. Hooks was not informed about these contractual documents prior to doing business with Defendant. Moreover, these versions are *not* applicable to every Plaintiff's account, because their Applications plainly reference different versions. *E.g.*, Applications (Exhs. C – E hereto). PNC updates these documents periodically and thus several different versions are potentially relevant to this case. Discovery is needed to confirm the nature and materiality of differences among the various versions of the contractual documents.

ridiculously one-sided in Defendant's favor.  One former agent commented: "I know no one on the inside team sent [the Program Guide] out."

48.     Management was well aware of this fact.  For instance, agents are supposed to write code in the top right hand corner of the second page of the Application reflecting the "Interchange Schedule Version" that was actually given to merchants.  Many agents did not do so, yet Applications were still approved by the SSQS team (the department that performs quality control checks on the completed Applications).

49.     Agents also routinely open accounts for businesses that did not need Defendant's services.  Merchants that have a very slight need for payment processing services were often told there was no downside to signing up because fees would only be charged if the services were used.  But there is no such thing as a fee-free account with Defendant.  These tactics ensnared Plaintiffs Abused Woman Ministries and Inkwell LLC.

50.     Additionally, agents routinely tell merchants that any "start-up fees" would be charged the first month but would later be reimbursed.  What the sales agents do not disclose is that a merchant must meet several conditions before receiving a "reimbursement."   Thus, merchants rarely get all of these fees back as promised.  Plaintiff Anita's was a victim of this tactic, as her "start-up fees" were only partially refunded by Defendant.

51.     Defendant's sales agents also tell merchants there are no "monthly minimum" processing volume requirements.  Such conditions are especially important to merchants with a start-up business or whose business fluctuates seasonally.  Sales agents are fully aware of the merchant's needs because merchants are required to disclose their business's nature during the application process.  Plaintiffs Abused Woman Ministries and Inkwell LLC were victimized by this lie.  They informed their sales agents that they might have no transactions in many months.

52.     It is also a standard practice of Defendant's sales agents to artificially inflate a merchant's projected sales volume on the application.  The sales agent fills in most of the blanks on the applications.  Sales agents, as a matter of course, put higher monthly volume estimates than they know is reasonable because, the higher the anticipated volume, the more likely their supervisors are to approve the pricing set forth in the application and the agents will be thus be credited with a "unit" toward their sales goals and will be one sale closer to meeting their Master's Club goals.  "Fudging the numbers" in this regard is critical for agents.

53.     If merchants notice the error in processing volume, Defendant's sales agents insist "oh, those are just the industry average volumes," "it's just standard," or "it's nothing to worry about."  Of course, it is something merchants need to worry about given the fine print in the Program Guide purports to allow Defendant to begin charging monthly minimum fees if merchants do not meet the inflated processing volume stated on their Applications.

54.     Until recently, the standard contract called for a three-year term that was terminable only upon the payment of hefty penalties of up to $900 ($25 per month x the number of remaining months of the contract), one of the highest early termination fees in the industry.  Agents were trained to avoid discussing this term and the fee at all costs.  Former employees have stated: "I don't know any rep that comes out and discloses the early termination fee if it's not prodded out by the customer."  Some representatives even affirmatively lied and said the deal is "cancelable at any time" to sell a unit.  As a result of this fraud, many merchants, Plaintiffs Abused Woman Ministries, Kelwin LLC, and Kosie among them, were signed up thinking that they could terminate without penalty at any time.

55.     In an August 2017 call with sales agents, as a further element of Defendant's effort to avoid a "Wells Fargo fake account scandal," Dave Shorten announced that Defendant

was finally responding to the massive numbers of complaints from customers by removing the early termination fee from new customer contracts. Merchants previously enrolled, however, would continue to be subject to the fee.

56. Sales agents also knew full well that merchants would pay loads of "junk fees" and markups that were not negotiated and are not described in their Applications. They were trained to omit discussion of the fine print term that Defendant may raise fees for any reason, even in some cases affirmatively misrepresenting that all fees are "locked" for a period of time.

57. By way of example only, the Application indicates that Defendant "reserves the right" to assess a "reasonable" "annual fee" to defray certain costs. Defendant worded the Application this way because it knew merchants would rarely agree to do business if they knew they would definitely be charged a large fee (typically $109.95 per year). Thus, Defendant used this language to lead merchants to believe such fee (the amount of which is not disclosed) may not be charged. Sales agents echoed this fact by telling customers "I can't remember the last time we did that" despite knowing full well that the fee was constantly charged every year.

58. Agents also mislead merchants by enrolling them in a three-tier qualified/mid-qualified/non-qualified pricing program. Agents inform merchants that most card transactions will qualify for the cheapest "qualified" tier and only the most unusual transactions will be routed to the mid-qualified or non-qualified tier. This is another blatant falsehood as Defendant programs its systems to ensure that all but a few types of card transactions will qualify for the lowest tier. Plaintiff Anita's was a victim of this scheme.

## C.     Defendant Seeks to Cover Up Illicit Charges.

59.     After locking merchants into long term agreements, sales agents know that it will not be long before Defendant begins increasing their fees or manipulating their transactions to accrue more fees. Indeed, fee increases are a matter of routine practice.

60.     Top management (Mr. Shorten, Ms. McQuade, and occasionally Mr. Haug) hold quarterly (and sometimes more frequent) calls with sales agents to press them to sell more units. During such calls, management often inform agents that "Quarterly Releases" (a/k/a "price releases" or just "releases") are going to occur. These terms are Defendant-speak for fee increases on existing merchants, which are imposed whenever Defendant seeks to increase profits.

61.     As a result of such unilateral increases, agents often received calls from angry merchants they had duped about the new fees. So Defendant designed a way to ward off such complaints before they occur.

62.     After a merchant enrolls, Defendant's sales agents check a box on their computer screens to opt the merchant out of receiving statements through the mail or electronically. This is known as "suppressing" merchant statements. All Plaintiffs were subjected to statement suppression at the outset of their relationship with Defendant.

63.     No merchants are advised at the outset of the relationship that their statements are being suppressed, nor would merchants have any reason to agree to such a practice. Itemized merchant statements serve two important purposes. First, they disclose what fees are being charged by Defendant and thus enable merchants to discover whether they are being overcharged. Second, in order to be able to argue that customers have been given advance notice

of new or increased fees, Defendant sometimes provides notices of new fees on the statements so they enable merchants to figure out if and when Defendant has decided to raise fees.

64.     Without detailed monthly statements, customers are forced to learn of the amounts taken by Defendant by consulting their PNC Bank checking account statements.  These bank statements show amounts debited and credited by Defendant.  No detail is provided so it is impossible for customers to know what specific rates and fees have been assessed or how much each rate and fee is.  Defendant thus takes its fees before any notice is available to merchants.

65.     Occasionally, merchants complain and demand to be provided processing statements.  However, rather than send a fully detailed itemized monthly statement, Defendant provides a "summary" statement that is not itemized, and which does not enable merchants to see individual fees and charges necessary to allow them to discover overbilling.  *E.g.*, Kosie Summary Statement (Exh. F hereto).

66.     Only if merchants persist are they provided with fully detailed, itemized statements.  For privilege of receiving such detail, Defendant often adds an additional monthly fee of $6.99 for paper statements and $4.99 for electronic statements.  Thus, to determine whether Defendant is adhering to its contract, merchants have to pay a monthly fee.  This is very unusual in the payments industry, where the sending of detailed monthly statements (whether by mail, email, or online) to all customers is the norm.

67.     The statement suppression practice is intended to, and does, keep merchants in the dark concerning Defendant's overcharges and reduce complaints.  Indeed, according to management, only a very small percentage of Defendant's customer base complains about fee increases.

68.     Customers that do realize they have been overcharged typically contact their agents first.  Agents were told to refer all callers to the 1-800 customer service line.  The most unscrupulous agents would ignore the calls completely.  Some agents who knew they had cheated customers, however, did make "special requests" to management for refunds.

69.     In the 2015-16 timeframe, management stressed to agents that they were authorizing far too many refunds and the company was losing too much revenue.  So management instructed agents to stop issuing refunds altogether and refer all customer complaints to the customer service department which, for all but the most diligent customers, is a bureaucratic dead end.  Customer service employees were well trained to avoid giving refunds.

70.     Customers that were not satisfied with customer service's response would often demand to terminate.  Defendant would instruct them to send a letter requesting termination without telling them that an early termination fee would be seized from their checking account for the privilege of terminating.  Only after the merchant called to question the fee would Defendant indicate that it was enforcing the early termination penalty in its contract (which, of course, most merchants do not know exists).

71.     Small business owners have posted innumerable independent reports of Defendant's practices, many of which mirror Plaintiffs' grievances.  For example, one business posted this in September 2016:

> When I opened my law office I searched for credit card processors. I located PNC and decided to use them because I was informed there would not be a mandatory monthly fee assessed but only transaction costs when the credit cards were used for payment. Several months after I paid $500 for the credit card processing machine I get a letter stating that a $19.50 monthly fee will be assessed beginning in October of 2016. By the letter, the company has unilaterally modified the contract and disadvantaged me by making me incur a fee that I did not expect and was told would not occur. I did receive a credit when I initially paid the $500. I indicated that I had no idea of predicting the gross sales when I signed up for the credit card processing agreement but was told the numbers would not matter. I

have requested a refund given the deceitful nature of how PNC Merchant Services treated me and their decision to unilaterally assess a monthly fee on my account.

Another merchant posted this in July 2016:

We have NEVER actually begun using Merchant Services. But our aggressive sales rep pushed us into getting the whole thing set up (and signing a contract) so we'd be ready when our business was at the point we were going to start accepting credit card payments. We were under the impression the contract wasn't in force until we actually activated the merchant services - but they have been charging us close to $50 a month with all the fees. When we tried to stop it we were treated coldly by their people on the phone and the issue was never resolved. Now, we found someone finally who wants to help but he's advised us to keep paying $15 a month or face more hefty fees. They've been basically stealing our money for a service we have never even used. Very disappointing.

And another from 2016:

Signed up under the guise of no monthly minimums or monthly fees. A few months into the account we started getting charged a $19.95 monthly "security" fee. Called up several times to cancel it. It took 5 months. More recently, without fair warning, they instituted a $19.50 monthly minimum. I took me 3 months to figure out what was wrong and when I asked for a refund they refused, claiming that their contract states that they can institute new fees any time they want. Never sign a PNC Merchant Services Contract!

And another from 2015:

My company is extremely dissatisfied with PNC Merchant Services. We are unable to close the account with this service due to a 3 year contract. My company is charged many additional fees to the $17.00 per month, and each time we have to call to find out the reason for the fee. At the end of 2014 we were charged just over $100 labeled as a financial adjustment fee. When I spoke with a customer service agent and asked what it was for, the individual admitted that it was a new charge not on my original contract, but that there was a message about this new charge on an online statement. Since I have never had access to any online statements where I may have seen information concerning this new charge, I insisted this charge be reimbursed. They were able to reimburse the financial adjustment fee after some convincing, but we are going to continue to receive these fees at the end of the year, along with many more. I would not recommend PNC Merchant Services to anyone, and I do not believe that this PNC service acts ethically in charging additional fees outside of a contract. Especially because it is a 3 year contract! If they choose to add additional fees and charges to their services, contract holders in contract prior to the invention of new fees should be grandfathered in, or be exempt from new fees not on the original contract, until the original contract time is up.

These are but a few examples. Such complaints span several years and are included on numerous small business websites and social media.

72. Defendant engages in systematic practices of overcharging customers, in violation of both the spirit and letter of the contract, and in contravention of the promises Defendant made to induce customers to enroll in Defendant's services. This case challenges the nature and amount of the overcharges Defendant imposes as well as the termination penalty Defendant seizes from merchants' bank accounts.

**E.     Defendant Buries Absurd, Unfair, Exculpatory Provisions in the Fine Print of the Program Guide.**

73. Even if Defendant had provided copies of its Program Guide, Interchange Qualification Matrix, and whatever other myriad of contract documents it contends governs merchant accounts, Defendant goes to great lengths to bury critical and unfair contractual provisions in the fine print.

74. For example, the form Application does not indicate that (a) the various agreed-upon fees and rates will increase (nor would increases be expected since technology and competition have actually driven down costs for payment processing) or (b) that new, undisclosed fees and rates will be charged.

75. Instead of conspicuously setting forth such critical provisions in the Application, Defendant buries certain attempted exculpatory clauses in the separate, fine print Program Guide – a boilerplate, non-negotiable document. *E.g.*, Sample Program Guide, p. 2 ("We will not accept any alterations or strike-outs to the Agreement and, if made, any such alterations or strike-outs shall not apply").

76.     Several terms in the Program Guide represent a unilateral effort by Defendant to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize itself from liability for improper practices.

77.     For example, the Program Guide purports to give Defendant unfettered discretion "to increase our fees or add new fees for Services for any other reason at any time, by notifying you thirty (30) days prior to the effective date of any such change or addition."  *Id.* at § 11.5.

78.     By way of additional examples, the Program Guide purports to (a) limit the total amount of Defendant's liability to $50,000 or twelve months of fees, whichever is less (*id.* at § 13.4) and (b) waive the merchants' right to a trial by jury (*id.* at § 31.3).

79.     Defendant uses these provisions, as well as the hefty early termination fee (*id.* at Part IV, § A(3)), as tools to discourage aggrieved merchants from terminating their relationships with Defendant or pursuing legal action for overcharges.

80.     Several of the provisions highlighted above, and others, violate public policy, lack mutuality, are illusory, unduly exculpatory, and unconscionable, and are otherwise void and unenforceable pursuant to applicable New York law.

81.     Buried deep in the fine print of the sample version of the Program Guide attached hereto as Exhibit B is the following provision:

> 11.10  You agree to promptly and carefully review your merchant statements or other documents provided or made available to you (physically, electronically, or otherwise provided by Us or others) reflecting Card transaction activity, including, activity in your Settlement Account.  If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is, or should have been effected or such shorter period as provided in the terms and conditions that govern such account.  If you notify us after sixty (60) days, we shall have no obligation to investigate or effect any adjustments.  Any voluntary efforts by us to assist you in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

82.     Defendant may claim this provision required Plaintiffs to provide written notice of any overcharges within 60 days of the overcharge.  This is incorrect.

83.     As a preliminary matter, there is no indication that these provisions are applicable to each Plaintiff.  As previously noted, the Program Guide attached hereto is but one of several versions.  These provisions may not appear in the Program Guide that is actually applicable to certain Plaintiffs' accounts, if any.

84.     Even if Section 11.10 (or its substantive equivalent) governs, since Plaintiffs were fraudulently induced to enter a contractual relationship with Defendant, the contract is subject to rescission and such provisions are not enforceable.

85.     Regardless, the provision is plainly inapplicable.  This provision tasks merchants with reviewing statements and other documents "reflecting Card transaction activity, including activity in your Settlement Account."   Merchants are tasked with checking how their "Card transaction activity" is reflected in their statements, comparing them to their own transaction records, and raising any discrepancies promptly.

86.     This requirement makes practical sense because: (a) merchants, not Defendant, are uniquely positioned to confirm the card transactions that occurred in their businesses or organizations, and to note any discrepancies; and (b) adjustments to card transactions may affect parties beyond the merchant and Defendant (e.g., the customer who paid and the credit card company that is getting paid), making prompt resolution important.

87.     The same is not true for charges like inflated mid and non-qualified fees and monthly fees which are levied directly by Defendant and not split with any third party. Defendant is in the best position to know if and when it is levying these fees, and such fees have no potential impact on any third parties.  Therefore, there is neither any need for merchants to

alert Defendant that these charges have been assessed – since it knows full well what its systems have been programmed to do – nor any reason why these issues would need to be raised within the very truncated 60-day window.

88.     Industry experts, including those with extensive experience dealing with First Data, which created the Program Guide and uses it in other partnerships, such as at Wells Fargo Merchant Services, have stated that the intention of this Section 11.10 (and similar provisions used by other payment processors) is clear:  merchants must promptly contact Defendant to correct any payment transactions that have been erroneously logged.  They confirm that such provisions have nothing to do with limiting refunds of Defendant's fees.

89.     Defendant's employees have often confirmed that the intent of this Section 11.10 – and the actual working interpretation used by Defendant – is that it applies to problems regarding payment transactions, not fees.  Indeed, Defendant refunds fees without regard to the inapplicable 60-day rule.  For example, Plaintiff Anita's was provided refunds of fees without any regard to Section 11.10.

90.     Defendant may claim that, since Section 11.10 requires merchants to provide timely notice as to adjustments to the merchant's "Settlement Account" and such term is defined to include "fees," Section 11.10 also requires merchants to notify Defendant of fee disputes.  At least some versions of the Program Guide do define "Settlement Account" in the "Glossary" section as follows:

> Settlement Account:  An account or account(s) at a financial institution designated by Client as the account to be debited and credit by Processor or Bank for Card transactions, fees, chargebacks and other amounts due under the Agreement or in connection with the Agreement.

91.     This definition merely confirms the obvious: the customer's linked bank account is where all credits and debits of every kind will be posted.  This definition does nothing to alter

the plain language of Section 11.10, however, which lists "activity in your Settlement Account" as a subset of "Card transaction activity." The "Glossary" defines "Card" as:

Card: Means a Credit Card and/or a Debit Card.

92. Thus, the clause about Settlement Account activity does not expand the activity at issue. Such an interpretation would render the provision's reference to "Card transaction activity" meaningless and without effect.

93. Indeed, the first sentence advises merchants to carefully review documents "reflecting Card transaction activity, including activity in your Settlement Account." Thus, merchants must promptly look at all documents reflecting "Card transaction activity," regardless of whether such documents relate to the Settlement Account or not, and seek any associated adjustments promptly. Defendant's interpretation would effectively write the term "Card transaction activity" out of Section 11.10 and must be rejected.

94. A more obvious reason that Section 11.10 does not apply is because it assumes itemized merchant statements are made available to merchants for review. But Defendant suppresses such statements and only provides them to a select few merchants that vigorously and repeatedly demand to see them. All merchants whose statements were suppressed by Defendant or who received summary statements, as described above, were not on notice that adjustments were necessary, such that they could have given timely written notice.

95. At the very least, merchants need not comply with the 60-day deadline unless and until they are provided with itemized monthly statements. The only one of the Plaintiffs that was provided itemized monthly statements lodged many timely written complaints concerning improper overcharges. *See* ¶¶ 125-147, *infra*.

96.     Thus, even if Section 11.10 is an applicable and enforceable condition precedent, Plaintiffs provided Defendant with timely, written notice of their grievances in compliance with these provisions.

## INDIVIDUAL FACTUAL ALLEGATIONS

97.     Plaintiffs are former payment processing customers of Defendant.

**A.     Abused Woman Ministries.**

98.     Before doing business with Defendant, Plaintiff Abused Woman Ministries and its leader Dr. Hooks had banking accounts with PNC Bank.  In September of 2014, as a result of Defendant's cross-marketing with PNC Bank, Dr. Hooks contacted Defendant to inquire about payment processing services.

99.     Dr. Hooks informed Defendant's representative Randi McKenna that she did not often need to process card transactions, but that she occasionally needed to accept credit or debit cards as payment for the purchase of her books.

100.     Dr. Hooks further explained to Ms. McKenna that in most months she would not be processing any transactions, she did not have much money, and therefore, that she could not be subject to any monthly minimum fees.  Ms. McKenna agreed and sent Dr. Hooks paperwork to sign.

101.     Upon receipt of this paperwork, Dr. Hooks noticed some inaccurate information on the forms.  Most notably, the anticipated transaction volume was grossly inflated.  The Application stated that Dr. Hooks processed $60,000 worth of card transactions annually.  *See* Abused Woman Merchant Application, p. 1 (Exh. C hereto).  This was not even close to being accurate.  Dr. Hooks informed Ms. McKenna that this was wrong and her true processing volume

fluctuated from month-to-month but would never be anywhere near this amount, but Ms. McKenna replied that filling in these amounts was "just standard."

102.     Of course, these amounts were not "just standard" but were falsified by Ms. McKenna in order to increase her own commission revenue.  As previously alleged, Defendant is well aware that its sales agents engage in such frauds.

103.     Based on Ms. McKenna's representation, and because the per transaction fees identified on the Application were consistent with what she and Ms. McKenna discussed and all the monthly fees were identified to be $0.00, Dr. Hooks electronically signed the Application. *Id.*

104.     Abused Woman Ministries chose to enroll in Defendant's services in significant part because of the fact that it would only pay fees when it used Defendant's services.  Had it known that Defendant would begin charging fees even when no transactions were processed, Abused Woman Ministries would not have done business with Defendant.

105.     For many months, Defendant seemingly honored the agreed-upon terms. Defendant did not send monthly account statements to Dr. Hooks, but she did not notice any improper fees being deducted from her bank account.

106.     In or about June 2016, Dr. Hooks was reviewing her bank statements and noted that Defendant had been deducting a $19.50 fee from her account for a few months.  Dr. Hooks had not used Defendant's services, so the fees could not have been based on transactions. Because Defendant never sent her statements itemizing such fees, she had no idea what these fees were.

107.     Dr. Hooks contacted the manager of her PNC Bank branch and requested that the fees be stopped.  The manager put her in touch with Defendant representative Mark Blackstock,

who explained that the fees were monthly minimum fees that Defendant had decided to impose because Plaintiff was not using the account and had misrepresented her anticipated annual transaction volume on her account.

108.     Dr. Hooks explained that she told Ms. McKenna the transaction volume was incorrect before the parties started to do business and Ms. McKenna's response.  Mr. Blackstock claimed that in any event, Defendant had the right to add new fees to the account and gave Dr. Hooks notice of this new fee in February 2016 via her monthly statement.

109.     Dr. Hooks explained that she had never received any monthly statements and thus did not receive any such notice.  Dr. Hooks was a victim of Defendant's practice of opting merchants out of receiving monthly statements to prevent them from ever receiving such notices or understanding the nature of the fees being charged.

110.     Mr. Blackstock indicated that the monthly fees would continue until her three-year contract expired in September 2017.  This was unacceptable to Dr. Hooks.  The whole reason she started doing business with Defendant was its agreement that she would not have to pay any such fees.

111.     Mr. Blackstock refused to stop the charges or to reimburse Dr. Hooks.  He stated that if she wanted to leave Merchant Services she would have to pay hundreds of dollars as an early termination fee, since she had entered a three-year agreement.  Dr. Hooks had never been told that it was a three-year deal or that any termination fees would apply.  Of course, since Merchant Services had agreed that she would have no monthly minimum fee, such terms would not have been a major financial concern anyway.  Only when Defendant imposed the new fee did the term and early termination fee become a threat to Abused Woman Ministries.

112.     Over the next several months, Dr. Hooks made posts on internet message boards warning others about Defendant's predatory practices.  She also complained in writing to several federal and state authorities and the Better Business Bureau but did not receive any satisfaction.  In August 2016, Mr. Blackstock offered a written response that offered no relief but merely summarized the positions articulated above.

113.     To make matters worse, Defendant deducted an additional $109.95 fee from Plaintiff's account that she never agreed to pay.  Again, because Defendant never provided Dr. Hooks with any statements, she did not know what this fee was for.  Upon information and belief, it was the discretionary "annual fee" that Defendant unilaterally adds to its merchants accounts to accrue additional profit at customer expense.

114.     Defendant continued to automatically debit Abused Woman Ministries' account for the recurring fees it never agreed to pay throughout its remaining time as a customer.  Dr. Hooks knew that Merchant Services would offer no relief so she complained directly to the branch manager at PNC Bank, begging him to help her stop paying these costly fees.  In 2017, after making substantial efforts, the branch manager was able to obtain a refund from Merchant Services for *some* of the improper fees.  Also, he was able to obtain a termination of Abused Woman Ministries' account without it being required to pay the early termination penalty.

**B.     Kelwin Inkwell, LLC.**

115.     The owner of Inkwell LLC, Mr. Warren, had a personal account with PNC Bank.  In October of 2015, he decided to open a business to sell his art works and went to PNC Bank to open a business checking account.

116.     He asked about accepting credit cards and was told to contact Merchant Services.

117.     He told the Merchant Services agent that sales would be low and erratic since it was a start-up business.  The agent agreed to sign Inkwel LLC up for a program that would be appropriate for such a business.

118.     Inkwell LLC chose to enroll in Defendant's services in significant part because of this fact.  Had it known that Defendant would begin charging fees even when no transactions were processed, Inkwell LLC would not have done business with Defendant.

119.     Plaintiff's business idea never got off the ground and never had the need to accept any credit card payments.  As a result, he never activated the account and never processed a single transaction with Merchant Services.

120.     Nevertheless, Defendant began to debit approximately $80 per month from Inkwell LLC's account.  Defendant never provided Mr. Warren with any statements itemizing such fees.  Inkwell LLC was a victim of Defendant's practice of opting merchants out of receiving monthly statements to prevent them from ever receiving statement notices or understanding the nature of the fees being charged.

121.     Even if the account had been activated, the fees actually charged by Defendant exceeded those that had been agreed upon.  Defendant never provided copies of the detailed monthly statements of Inkwell LLC, so Plaintiff cannot describe these overcharges in more detail.

122.     Inkwel LLC received a letter dated May 6, 2016, which stated:

> As of today, you have not activated your account and we have not received any credit card transactions from your establishment.  We would like to ensure that you have every opportunity to realize the benefits of PNC Merchant Services' credit card processing.
>
> If you are still interested in accepting credit cards, please contact us as soon as possible.  You can call our Account Specialist area at **1-800-742-5030** within the

next fifteen (15) days to complete your implementation process or to extend the timeframe.

Unfortunately, if you do not contact us within that timeframe, the Agreement will be terminated due to non-activity effective thirty (30) days from the date of this letter, and all applicable termination fees will apply.

123.     Mr. Warren called Merchant Services and told the representative that he was never told he had to use the account and/or that he would be stuck in a long-term deal subject to early termination fees.  Defendant's representative informed Mr. Warren that Inkwel LLC would have to pay a termination fee of several hundred dollars.  Thus, even though Inkwel LLC had never even completed its account registration, and had already paid Defendant roughly $500 for nothing, Merchant Services still insisted it was owed hundreds of additional dollars.

124.     Inkwel LLC could not afford to pay the termination fee.  Nevertheless, Defendant seized all of the remaining funds from Plaintiff's business account and PNC Bank closed the account.

## C.     Anita's Skin & Body Care.

125.     Anita's owner, Anita Phillips, held personal and business accounts with PNC Bank.

126.     For years, Anita's did not accept credit cards.  However, Ms. Phillips decided to start accepting credit cards to provide her clients with more payment options after the economic downturn.

127.     In or about September 2012, PNC Bank's local branch manager Patti Walsh and a Merchant Services sales agent named "Don Phillips" (no relation to Anita) visited Anita's to offer payment processing.  Ms. Walsh and Mr. Phillips explained provisions of a payment processing agreement and presented Ms. Phillips with a "pricing summary" that set forth the fees Anita's would pay if it did business with Defendant.

128.     Ms. Phillips expressed interest and Mr. Phillips drew up an Application.  Upon review, the Application contained several pricing provisions that were substantially different than the terms that were discussed.  For instance, Mr. Phillips included various fees that had never been disclosed, including costly "start-up" and "billed monthly fees."

129.     Anita's owner rejected the agreement and requested that it be changed to remove these fees.  Mr. Phillips then struck through such fees, initialing "DP" next to each strike-through.  *See* Anita's Application (Exh. D hereto).  Ms. Phillips also noted that certain facts on the Application were incorrect, most notably that 100% of her sales would be phone orders.  Mr. Phillips told her this provision was inconsequential and she should ignore it.  Because the identified fees now comported with what the parties had discussed, Anita's signed the Application.  Ms. Walsh reviewed and approved the Application.

130.     After Anita's opened its account and began processing payments through Defendant, it expected to receive monthly statements reflecting account activity but it did not.  However, the amounts being deducted from the bank account did not seem unreasonable, so Anita's assumed Defendant was operating pursuant to the contract.  Ms. Phillips did find it odd that debits Defendant took from her account were falsely labeled "DEPOSITS" on her monthly bank statements.

131.     Initially at least, Anita's was a victim of Defendant's practice of opting merchants out of receiving monthly statements to prevent them from ever receiving statement notices or understanding the nature of the fees being charged.

132.     In or about May 2013, Ms. Phillips noticed Defendant made some debits from her account that seemed unreasonably high, so she contacted her sales agent Don Phillips to request more information.  When he could not explain the fees to her she asked that he send her

itemizations of her fees. He responded by sending all statements on her account to date, which contained improper fees (as described below). At this point, Anita's demanded that she receive monthly statements going forward, which she thereafter did begin to receive electronically.

133. During its time as a customer, Defendant repeatedly charged Anita's "junk fees" it never agreed to pay, for instance:

(a). In September 2012, Defendant charged Anita's a "GLOBAL GTWAY VIRT TERMINL FEE" of $15.00. However, Defendant did not even activate Anita's account to use the "First Data Global Gateway" processing technology until October 2012; thus, the charging of the fee in September 2012 was premature.

(b). Merchant Services also charged Anita's a $195 "set up" fee, which Mr. Phillips said would be rebated in his sales pitch. However, only $150 of the fee was eventually refunded, after extensive efforts by Ms. Phillips to obtain the payment.

(c). In October 2013, October 2014, and October 2015, Anita's was charged a $109.95 annual fee. This fee is not identified in the Application as a fee Anita's would pay. Although Defendant reserved for itself discretion to add "a reasonable [annual] fee to defray the cost of necessary systems technology upgrades, communication requirements and reporting," Anita's was never told the fee definitely would be charged. Moreover, the $109.95 fees charged are neither "reasonable" nor were they needed to defray "necessary" costs. Application, p. 3. Rather, they were imposed as a planned "release" strictly to pad Defendant's bottom line at Anita's expense.

(d). Starting in November 2014 and continuing each month during Anita's time as a customer, Anita's was charged $6.99 paper statement fees even though the contract explicitly indicated that such fees would *not* be charged. *See* Application, p. 2. Indeed, this was

one of the fees that Don Phillips struck through, thus indicating it would not be charged. *Id.* Anita's never subsequently requested that it be sent monthly statements via mail and had received them electronically prior to the fee starting.

134. Anita's was also a victim of Defendant's tiered pricing fee scheme. In its Application, Anita's agreed to three-tiers of discount fees: qualified discount rates (1.59%), mid-qualified discount rates (2.39%), and non-qualified discount rates (3.19%).

135. Whether a card qualified for a given tier was apparently solely within Defendant's discretion. Unsurprisingly, Defendant exercised its discretion to route all card transactions to the higher cost mid-qualified and non-qualified tiers. Indeed, throughout its more than three years as a customer, it does not appear that a single one of Anita's credit card transactions *ever* qualified for the lowest tier. All were either deemed by Defendant to be "mid-qualified" or "non-qualified" and assessed rates of 2.39% or 3.19%, respectively.

136. Moreover, whenever it wanted to earn even more profit from Anita's account Defendant simply revised the designations of card transactions that were previously mid-qualified to being non-qualified. For instance, starting in 2014 almost every single MasterCard transaction that Anita's accepted was re-designated by Defendant from the mid-qualified tier to the non-qualified tier and assessed the highest rate. By arbitrarily changing card transactions to the higher rate tiers, Defendant acted in bad faith. There was no outside basis whatsoever for such changes; it was an internal move to goose profits.

137. The monthly statements Defendant eventually provided to Anita's failed to give it the information it needed to verify whether Defendant's classification of transactions into designated tiers was accurate. For instance, such statements do not explain why individual card transactions were deemed mid-qualified or non-qualified as opposed to qualified. Because

Defendant concealed such information, Anita's had no way to determine if Defendant was wrongfully routing transactions to Anita's detriment, which it routinely did.

138.    Anita's chose to enroll in Defendant's services in significant part because of the negotiated rate for qualified transactions.  Had it known that Defendant would designate all transactions as mid-qualified and non-qualified, Anita's would not have done business with Defendant.

139.    Anita's complained, telephonically and in writing via email, to Defendant on multiple occasions.  In May 2013, Anita's emailed Don Phillips to find out why all of her card transactions were being routed to the highest rate.  Mr. Phillips responded he would find out and get back to her.  Mr. Phillips subsequently responded that the higher rates were being incurred because Anita's had been instructed to process cards incorrectly.  Mr. Phillips indicated that a refund would be processed and offered to give Anita's a "gift" payment processing terminal.  But the refund never came and the terminal had no value to Anita's.

140.    Anita's also complained about the numerous "junk fees" it was being charged. For instance, in October 2013, Anita's complained about the recently-imposed annual fee, which had caused her account to become overdrawn and several overdraft fees to be charged.  Because Mr. Phillips by this point had stopped returning her calls and emails, Ms. Phillips called PNC Bank customer service.  They refused to help, saying it was a Merchant Services problem.  Ms. Phillips then called Merchant Services customer service.  The representative acknowledged the impropriety of the fee, said it would never be charged again, and indicated Defendant would refund half the fee and reimburse Anita's for the overdraft charges.  Ms. Phillips was not satisfied with this offer, which did not make her whole.  However, in any event, Defendant did

not make good on its promises. No portion of the annual fee was refunded nor were any of the resulting overdraft fees.

141. In November 2014, Ms. Phillips again contacted Defendant's customer service department to complain about the recently imposed annual fee, which she had previously been told would not be charged again. Again, Defendant's customer service department offered to refund half the fee. This refund of $54.98 was applied in December 2014.

142. In January 2015, Ms. Phillips again contacted customer service, this time to figure out why she was being charged $6.99 monthly paper statements fees. Customer service promised to investigate this fee and get back to her but never did. The improper charges continued throughout Ms. Phillips' time as a customer.

143. In November 2015, Ms. Phillips again contacted customer service to challenge the annual fee. This time, Merchant Services agreed to refund the entire fee, which it did.

144. By this time, Anita's had grown sick and tired of Defendant's overbilling. Ms. Phillips got in touch with a "higher up" at PNC Merchant Services, Andrea Clark. Ms. Clark instructed Anita's to submit a written summary of the problems and promised to review the submission and consider refunding all improper charges.

145. Merchant Services' billing practices made this task exceedingly difficult. Defendant continually lumped fees together with money owed to Anita's in monthly statements. Merchant Services also automatically deducts funds out of merchants' bank accounts, leaving them an uphill battle to recover money deducted before the merchant even sees a "bill." Anita's owner spent substantial time trying to decipher the various fees assessed each month and then submitted a full accounting and summary to Merchant Services, as instructed.

146.     Some six weeks later, Anita's had not heard back from Merchant Services. Anita's reached out to Ms. Clark, who responded that Merchant Services was researching the discrepancies identified in Anita's thorough submission.  However, Ms. Clark refused to provide Anita's with any documentation, citing Merchant Services "policy."  Unsurprisingly, Merchant Services ultimately elected not to offer Anita's any retribution for the improper charges Anita's identified.  Ms. Clark informed Ms. Phillips that even if some of the fees charged by Defendant were improper, she had received a good deal on a free checking account with PNC Bank, so everything balanced out in the end.  This after-the-fact rationalization was, of course, unacceptable to Ms. Phillips.

147.     The "straw that broke the camel's back" came for Anita's in late 2015.  Some of Anita's clients began questioning charges to their credit cards and wondering if Anita's was marking them up.  Anita's was of course not marking them up and can only assume PNC Merchant Services was adding improper charges to the transactions.  Because of increasing concern from Anita's clients – due to PNC Merchant Services at least negligent practices – Anita's was forced to stop accepting credit card payments on December 1, 2015.  This alone cost Anita's substantial revenue it would have realized, but for Merchant Services' conduct.

**D.     D.B. Kosie & Associates.**

148.     Kosie has banked with PNC Bank and its predecessor National City Bank for approximately 15 years.  In May 2015, PNC Bank referred Kosie to Defendant for payment processing services.

149.     On May 13, 2015, Kosie signed an Application with an "Interchange Plus" pricing plan.  Specifically, Kosie agreed to pay the actual interchange and assessment fee rates imposed by the card brands "at cost," plus .30% of the amount submitted for processing, plus

$0.12 for each transaction.  *See* Kosie Application, pp. 2-3 (Exh. E hereto).  Kosie also agreed to pay certain other fees, most notably a monthly $10 "Payeezy Gateway Monthly Fee."  *Id.*

150.     After Kosie opened its account and began processing payments through Defendant, it expected to receive monthly statements reflecting account activity but it did not. Kosie watched its bank account closely for a few months to ensure Defendant was only debiting the fees which Kosie agreed to pay.  Kosie noted that the fees being deducted were approximately 3.0% of its card transaction volume, which is what Defendant's sales agent said Kosie could expect to pay.

151.     Kosie was a victim of Defendant's practice of opting merchants out of receiving monthly statements to prevent them from ever receiving statement notices or understanding the nature of the fees being charged.

152.     For the next several months, Kosie stopped paying close attention to the amounts Defendant was deducting from its account.  Eventually, toward the end of 2016, Kosie noticed that the fees seemed to be extremely high and that Defendant was deducting massive fees from its accounts even in months when no card transactions were occurring.  By this time, Kosie's effective rate had jumped from 3.0% of card volume *to more than 10.0%.*

153.     Kosie's owner, Bob Kosie, contacted Defendant's customer service department and inquired as to why his rate was so high.  The only explanation he received was that he was not accepting the right kind of cards, which made no sense to him since he was on a flat cost-plus program.

154.     Mr. Kosie informed customer service that he would like to terminate the account. The representative tried to keep the business by offering a reduction in the "plus" portion of the cost plus rate.  However, Mr. Kosie had no confidence in Defendant and reiterated his request to

terminate. The representative instructed Mr. Kosie to send a letter electing termination and that the agreement would end upon receipt.

155.    In February 2017, Kosie sent a letter to Defendant notifying it of Kosie's immediate termination, as instructed. Nonetheless, Defendant continued to charge monthly fees in March and April 2017. On April 20, 2017, Defendant Merchant Services deducted a $325.00 early termination penalty from Kosie's bank account. Merchant Services never mentioned the termination penalty when it instructed Kosie to send a termination letter.

156.    Kosie called customer service to inquire about the $325 penalty and was told it consisted of $25 times the number of months left on his contract (13). This amount exceeds the amount Kosie would have been obligated to pay had he not terminated the deal and simply waited out the balance of his contract. Indeed, under the agreement, Kosie agreed to pay a $10 "Payeezy Gateway Monthly Fee." All other fees are based only on *transactions*. Plaintiff Kosie ***did not agree to make any minimum number of transactions*** per month. Thus, Kosie only agreed to pay minimum fees of $10 per month, or $130 over the remaining balance of the contract.

157.    In Kosie's case, this means Defendant seized ***more than twice*** the amount of money it was guaranteed under the purportedly non-cancellable term. Despite Kosie's requests, Defendant refused to refund any portion of the early termination penalty.

158.    It was extremely irritating to Kosie that he was charged more to terminate its deal with Defendant than to simply wait out the term. At this point, Kosie demanded that Defendant send him itemized statements breaking down of all fees Kosie had been charged during its time as a customer. Defendant responded that it would send such statements in exchange for a fee of

$4.99 per statement plus $30.00/hour for the time it took to prepare such statements.  Kosie agreed to pay this absurd fee to find out how much Defendant had overbilled.

159.    When Defendant finally sent the statements, Kosie discovered that they did not even contain an itemized breakdown of charges.  By way of example only, the summary statement Defendant sent Kosie for November 2015 is attached hereto as Exhibit F.  This statement shows that Defendant charged Kosie $34.99 even though no transactions were processed during this month.  $10.00 of this amount is likely the "Payeezy Gateway Monthly Fee."  The remainder is a mystery.  Even if Defendant had not opted Kosie out of receiving statements and had provided them on a timely basis, Kosie still would not have been able to determine what it was being charged for.

160.    To this day, Kosie still has no idea why Defendant imposed the majority of the fees it took from Kosie's account.  Upon information and belief, Defendant inflated its revenue by surreptitiously adding monthly service fees (e.g., annual fee, monthly minimum processing fee, etc.) that Kosie never agreed to pay in its Application.

161.    As a consequence of Defendant's fraudulent, unfair, and improper policies and practices, Plaintiffs and the members of the proposed classes have been wrongfully forced to pay unauthorized fees and charges, including as set forth herein.  Defendant has improperly deprived Plaintiffs and those similarly situated of significant funds, causing ascertainable monetary losses and damages.

162.    The improper fees and charges described herein are illustrative only and are not intended to provide a full listing of the improper fees paid by Plaintiffs or the members of the proposed classes.  Indeed, as previously noted, Defendant never sent certain Plaintiffs monthly

statements and the monthly statements it did send did not contain sufficient information, thus making it impossible for Plaintiffs to discover the nature and amount of all overcharges.

163.     After initial discovery, Plaintiffs will be in a position to detail all overcharges.

## CLASS ALLEGATIONS

164.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.

165.     The classes are preliminarily defined as:

All United States customers of PNC Merchant Services that paid a monthly or annual fee not authorized in their merchant application (the "Upcharge Class").

All United States customers of PNC Merchant Services that paid a higher rate based on a transaction being improperly designated mid-qualified or non-qualified (the "Re-Designation Class")

All United States customers of PNC Merchant Services that paid a termination fee or penalty in violation of applicable New York law (the "Termination Fee Class").

166.     Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate and as the Court may otherwise allow.  It is very likely that additional classes or subclasses will be appropriate.

167.     Excluded from the classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

168.     The time period for the classes are the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

All of Defendant's contracts mandate that New York law be applied. New York imposes a six-year statute of limitations on breach of contract actions. Thus, if New York law is deemed to apply, the relevant class periods are likely to begin in October 2011 and extend through Defendant's change in conduct or the conclusion of the case.

169.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

170.     **Numerosity.** The members of the classes are so numerous that individual joinder of all the members is impracticable. There are hundreds of thousands of merchants that have been damaged by Defendant's wrongful conduct as alleged herein. The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

171.     **Commonality and Predominance.** Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members. Such questions include, but are not limited to:

(a).     Whether Defendant acted and continues to act fraudulently in inducing merchants to contract with Defendant;

(b).     Whether Defendant acted and continues to violate its contract with merchants by assessing improper fees;

(c).     Whether, to the extent Defendant's overcharges do not violate express provisions of the merchant agreement, they violate the covenant of good faith and fair dealing;

(d).     Whether Defendant is liable to Plaintiffs and the other Class members for imposing improper fees on merchants for Defendant's own benefit;

(e).     Whether Defendant's form liquidated damages clause is unenforceable as a matter of law;

(f).     What the proper legal remedy or remedies for Defendant's extrajudicial enforcement of its liquidated damages provisions are;

(g).     Whether Defendant should be required to repay all money it has gained from extrajudicial enforcement of its liquidated damages clause;

(h).     Whether certain contractual provisions in Defendant's form merchant agreements are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(i).     The proper method or methods by which to measure damages and/or restitution; and

(j).     Whether Defendant should be enjoined from engaging in any or all of the improper practices complained of herein.

172.     Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

173.     **Typicality.**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and

assert the same legal theories.  Further, Plaintiffs and members of the Classes were comparably injured through the uniform misconduct described above.

174. **Adequacy of Representation.**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

175. **Declaratory and Injunctive Relief.**  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant continues to knowingly overbill the Classes and utilize unenforceable contractual provisions in order to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

176. **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast,

the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Breach of Contract and Breach of the**
**Covenant of Good Faith and Fair Dealing**

177.     Plaintiffs repeat paragraphs 1 through 176 above.

178.     Plaintiffs and the Class members each entered into form contracts with Defendant.

179.     The actions taken by Defendant have materially violated the specific terms of these form contracts, such as by:

(a).     charging monthly minimum processing fees even though contracts show no such fee, including where the form is blank, where the fee is struck-through, or the fee is identified as $0.00 in the Application;

(b).     charging annual fees that are unreasonable and/or greater than necessary to "defray the cost of necessary systems technology upgrades, communication requirements and reporting";

(c).     providing less than full refunds for "start-up fees" that Defendant expressly agreed would be refunded;

(d).     imposing monthly service fees before the corresponding services were provided;

(e).     charging additional "billed monthly fees," including paper statement fees, that either were not specified in the Application, violated the conditions placed on such fees by the Application, or were specified in lesser amounts in the Application;

(f)  unilaterally marking up fees merchants agreed to pay in their Applications or adding new fees without first providing timely advance notice to merchants.

180.  Further, through its conduct alleged herein, Defendant has separately breached its form contracts with Plaintiffs and the Class members by exercising the discretion afforded by the contract to raise fees or add new fees in violation of the covenant of good faith and fair dealing.

181.  For instance, in exercising its discretion to raise fees or add any new fees, Defendant abused that discretion. Indeed, Defendant imposed these increases not in response to any external factor but merely to pad its own bottom line. The increased fees far exceed what Plaintiffs and the Class members reasonably expected and were led by Defendant to expect. This conduct by Defendant was arbitrary and in bad faith. This claim is brought in the alternative to Plaintiffs' direct breach of contract claims (¶¶ 179(a)-(f)). Specifically, if Defendant is determined to have the contractual discretion to charge Plaintiffs different fees than those specified in the Application such that the complained of fees are not direct breaches, Defendant nonetheless breached the covenant of good faith and fair dealing by charging such fees.

182.  Defendant also separately violated the covenant of good faith and fair dealing by designating qualified transactions to mid-qualified or non-qualified pricing tiers, and mid-qualified transactions to the non-qualified tier. Such decisions were not in response to any external factor but rather to increase Defendant's own profit at merchants' expense. Defendant's activities in this regard far exceed what Plaintiffs and the Class members reasonably expected and were led by Defendant to expect. This conduct by Defendant was arbitrary and in bad faith.

183.  Defendant's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the Class members the full fruits of their bargains with Defendant.

184.     Plaintiffs and the Class members have performed all conditions precedent to suit and all, or substantially all, of the other obligations imposed on them under the contracts.

185.     Defendant's breaches of contract have resulted in damages sustained by Plaintiffs and members of the Overcharge Class and Re-Designation Class.

186.     Defendant's anticipated attempts to defend its overcharging through reliance on fine print contractual provisions in the Program Guide and elsewhere will be without merit. Such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the hidden nature of Defendant's misconduct, among other reasons. These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Classes from recovering for such breaches.

187.     Plaintiffs and the Class members have sustained damages as a result of Defendant's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.

## COUNT TWO
### Unlawful Termination Penalties and Conversion

188.     Plaintiffs repeat paragraphs 1 through 176 above.

189.     Under New York law, a liquidated damages provision is unlawful and unenforceable if either (a) the potential actual damages resulting from a breach of contract are ascertainable at the time the contract is entered; or (b) the liquidated damages contained in the contract are grossly disproportionate to any actual damages suffered.

190.     Defendant Merchant Services' extrajudicial award of excessive liquidated damages is unlawful under both standards. Potential actual damages are readily ascertainable for all agreements Defendant enters with merchants. Defendant's calculation of liquidated damages

is also grossly disproportionate to the actual damages it suffers after a merchant terminates a processing agreement.

191.     Moreover, Plaintiffs are unaware of Defendant's rationale for claiming liquidated damages from a customer who has not completed the enrollment process or received any services from Defendant; however, Plaintiffs assert this action is unlawful.

192.     Nonetheless, Defendant intentionally removed a specific sum it calculated as an early termination penalty from merchants' bank accounts.

193.     The specific sum can be readily determined from Defendant's records and accountings.  In Plaintiff Kosie's case, the specific sum was $325 deducted from Kosie's bank account on April 20, 2017.  Defendant had no legal right to take such funds.

194.     Defendant's possession of these funds excludes Plaintiff Kosie, Plaintiff Inkwell LLC, and members of the Termination Class from possessing and enjoying the benefit of that money, which they have a right to do.

195.     Plaintiff Kosie, Plaintiff Inkwell LLC, and members of the Termination Class possessed or had a right to possess the sums prior to Defendant taking it.

196.     Defendant's unlawful taking of termination fees harmed Plaintiff Kosie, Plaintiff Inkwell LLC, and the members of the Termination Fee Class.  Plaintiffs Kosie and Inkwell LLC and the members of the Termination Fee Class seek damages for their injuries to be awarded by a jury.

197.     Plaintiffs and members of the Termination Fee Class also seek a judicial determination as to the legality of the termination fee practices complained of herein.  A judicial declaration is necessary and appropriate at this time in order for Plaintiffs and the Termination Fee Class to ascertain their rights and duties.

## COUNT THREE
## Fraudulent Inducement

198.     Plaintiffs repeat paragraphs 1 through 176 above.

199.     As alleged herein, Defendant concealed (and continues to conceal) its true fee practices, and intentionally and fraudulently induced Plaintiffs and the Class members to enter into contracts with Defendant through its material omissions and material affirmative promises of fee terms that Defendant never had any intention to honor.  *See* ¶¶ 44-58, *supra*.

200.     Defendant knew that its pre-contract disclosures did not accurately reflect the prices and fees it would ultimately charge merchants, including Plaintiffs and the other Class members, at the time the terms were provided to such merchants.  Defendant made the foregoing misrepresentations and omissions alleged herein to induce Plaintiffs and the other members of the Classes to rely on them.

201.     Defendant's misrepresentations and omissions alleged herein were material, including in that they would be considered very important to merchants in deciding whether or not to do business with Defendant, and were known by Defendant to be false and misleading.

202.     Defendant's true pricing terms and model include scores of additional fees.

203.     Prior to executing Applications and forming a contract with Defendant, Plaintiffs and the other Class members were deceived by Defendant with respect to its fee practices.

204.     The nature and amounts of fees that would actually be charged, as represented by Defendant at the time of merchant enrollment (including in the in the Application) were material to and justifiably relied upon by Plaintiffs and the other Class members.  Had Defendant accurately represented its true fee practices to Plaintiffs and the other Class members, and not misrepresented, obscured, and concealed them, Plaintiffs and the Class members would not have contracted with Defendant to receive payment processing services.

205.     Accordingly, Plaintiffs and the other Class members were fraudulently induced to enter into contracts with Defendant.

206.     Plaintiffs are entitled to seek damages and/or rescission of their contracts with Defendant, or other equitable relief, including restitution of funds Defendant took from them without permission.

207.     Plaintiffs will make any necessary election of remedies at the appropriate juncture.

## COUNT FOUR
## Unjust Enrichment

208.     Plaintiffs repeat paragraphs 1 through 207 above.

209.     Plaintiffs and the Class members assert a common law claim for unjust enrichment.  This count is brought only in the alternative and is contingent on Defendant's form contracts with Plaintiffs and the Class members being deemed ineffective, inapplicable, void, or unenforceable as to one or more claims stated herein.  In such scenario, unjust enrichment will dictate that Defendant disgorge its ill-gotten gains.

210.     As alleged herein, Defendant was unjustly enriched at the expense of Plaintiffs and the other members of the Classes, who were grossly and inequitably overcharged by Defendant.

211.     Plaintiffs and the other members of the Classes were unjustly deprived of money obtained by Defendant as a direct and proximate result of its undisclosed, deceptive, unfair, unscrupulous, and unconscionable fee and billing practices alleged herein.

212.     It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other members of the Classes as a result of its wrongful conduct alleged herein.

213.    Plaintiffs and the other Class members are entitled to seek and do seek restitution from Merchant Services as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Certifying this case as a class action pursuant to Federal Rule 23;

2.    Temporarily and permanently enjoining Defendant from continuing the improper business practices alleged herein;

3.    Granting rescission of the contracts;

4.    Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

5.    Awarding restitution of all improper fees seized by Defendant from Plaintiffs and the members of the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

6.    Awarding actual, compensatory, general, nominal, punitive, and exemplary damages as allowed by law in an amount to be determined by a jury;

7.    Awarding pre-judgment interest at the maximum rate permitted; and

8.    Awarding such other relief as this Court deems just and proper.

DATED this 6th day of February, 2018.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing by emailing a copy of same to ensure delivery upon the following:

Justin J. Kontul, Esq.
REED SMITH
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
jkontul@reedsmith.com

*Counsel for Defendant*

DATED this 6th day of February, 2018.

*/s/ E. Adam Webb*
E. Adam Webb