UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

HEALING FOR THE ABUSED WOMAN
MINISTRIES; KELWIN INKWEL, LLC; ANITA'S
SKIN & BODY CARE; D.B. KOSIE &
ASSOCIATES; CHOI'S BEER SHOP, LLC; and
ABRAMOFF LAW OFFICES, on behalf of
themselves and all others similarly situated,

**[CORRECTED]
MEMORANDUM & ORDER**

**17-CV-6255 (NGG) (CLP)**

Plaintiffs,

-against-

PNC MERCHANT SERVICES COMPANY, L.P.,

Defendant.
------------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs Healing for the Abused Woman Ministries ("HAWM"), Kelwin Inkwel, LLC

("Inkwel"), Anita's Skin & Body Care ("ASBC"), D.B Kosie & Associates ("DBKA"), Choi's

Beer Shop, LLC ("Choi's LLC"), and Abramoff Law Offices ("ALO") bring this consolidated

putative class action against Defendant PNC Merchant Services Company, L.P. (See Am.

Consolidated Class Action Compl. ("CCAC") (Dkt. 36).) Plaintiffs assert four causes of action

under New York law: (1) breach of contract and breach of the covenant of good faith and fair

dealing; (2) conversion; (3) fraudulent inducement; and (4) unjust enrichment. (Id. ¶¶ 258-304.)

Now before the court are Defendant's motions to dismiss the complaint under Federal

Rule of Civil Procedure 12(b)(6) and to strike the jury demand contained therein.[1] (Def. Mot. to

Dismiss ("Mot.") (Dkt. 27).) For the reasons set forth below, Defendant's motion to dismiss is

---

[1] While Defendant did not specify the rule under which it moves the court to strike the jury demand, the court will
construe this section of Defendant's motion as having been brought under Federal Rule of Civil Procedure 39(a)(2).

GRANTED in part and DENIED in part. Defendant's motion to strike the jury demand is
GRANTED.

## I.    BACKGROUND

### A.    Factual Allegations

The following factual summary is drawn from the facts alleged in the CCAC, which the

court generally accepts as true for the purpose of adjudicating Defendant's motion to dismiss, as

well as from documents attached to the CCAC and statements or documents incorporated into

the CCAC by reference or relied upon so heavily as to be "integral" to the CCAC. See N.Y. Pet

Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir. 2017); Goel v. Bunge, Ltd., 820

F.3d 554, 559 (2d Cir. 2016).

#### 1.    Common Factual Allegations

Defendant is a Delaware limited partnership co-owned by PNC Bank and First Data

Corporation that provides credit and debit card processing services to more than 125,000

merchants. (See CCAC ¶¶ 20-22.) Defendant obtains merchant customers through a sales team

comprising "inside" sales agents (who follow up, either by email or telephone, on customer leads

developed by PNC Bank), and "outside" sales agents (who work primarily at PNC Bank's retail

branches and visit potential customers at their places of business to pitch Defendant's services).

(Id. ¶¶ 27, 44.)

Plaintiffs allege that low commissions coupled with poor training has fostered a culture

of deception among Defendant's sales agents. (See id. at ¶¶ 27-45.) For example, Plaintiffs

allege that inside sales agents are required to participate in monthly "Call Listening Sessions,"

during which they are played a recorded telephone interaction between a fellow sales agent and

potential customer that, by Defendant's own metrics, has earned a "Quality Score" of 5.0 (out of

5.0). (Id. ¶ 32.) Because, however, Defendant calculates its quality scores based entirely on superficial factors such as whether an agent is "nice" to the customer (Id. ¶ 31) these calls routinely feature sales agents withholding key information from their customers and thereby, according to Plaintiffs, deceiving such customers (Id. ¶ 32).

Merchants who express interest in Defendant's services are asked to sign a Merchant Payment Processing Application and Agreement (an "Application"), which is typically filled out by the sales agent. (Id. ¶¶ 47, 101, 143, 207.) Sales agents advise merchants that signing the application "is a necessary step to determining whether it is eligible to do business with [Defendant,] and . . . if the merchant is approved, the agent will be back . . . to finalize the deal." (Id.) However, according to Plaintiffs (and by the terms of the Application itself), completion of the Application locks merchants into a three-year term upon approval by Defendant. (Id.)

The specific terms and conditions governing the parties' relationships are detailed in separate documents known as the "Program Guide" and "Interchange Qualification Matrix" (collectively, and together with the Application, the "Merchant Agreement") which, according to Plaintiffs, are typically not provided to a merchant until after she has signed an Application. (Id. ¶ 48.) Plaintiffs assert that sales agents intentionally withhold these documents. (Id. ¶ 49.) However, by signing the Application, the merchant "acknowledges having received and read" both of these documents (see, e.g., HAWM Appl. (Dkt. 36-3) at ECF p. 4) and "are stuck with their provisions" (CCAC ¶ 49). Thus, according to Plaintiffs, Defendant's sales agents enroll merchants "without providing them the vast majority of the terms that govern the contracts" between the parties. (Id. ¶¶ 49-50.)

Plaintiffs further allege that sales agents routinely deceive merchants regarding the terms of the Merchant Agreement. (Id. ¶ 51). For example, Plaintiffs allege that sales agents tell

merchants that there are no minimum processing volume requirements when, in fact, the Merchant Agreement permits Defendant to charge a monthly minimum fee to merchants who do not meet minimum processing volumes set forth in their Applications. (Id. ¶¶ 53, 55; see also Program Guide ("Guide") (Dkt. 36-1) §§ 11.3, 11.5.)[2] In service of this scheme, Plaintiffs allege that sales agents regularly write in "higher monthly volume estimates than they kn[o]w to be reasonable" when filling out an Application, and assure concerned merchants that "those are just industry standard volumes" and that there's "nothing to worry about." (Id. ¶¶ 54-55.) As another example, though the Merchant Agreement has a three-year term and, until recently, contained a provision calling for an early termination fee (id. ¶ 56; Guide pt. A.3), Plaintiffs allege that "[a]gents [are] trained to avoid discussing this term and the fee" with merchants and that some agents affirmatively represent that the deal is "cancelable at any time" (CCAC ¶ 56).

According to Plaintiffs, once an Application is submitted and approved, Defendant engages in various tactics to increase its revenue at merchants' expense, including by manipulating transactions to accrue additional fees and raising fees levied on merchants. (Id. ¶ 62.) In order to conceal these additional fees, sales agents allegedly opt merchants out of receiving detailed account statements without their consent or knowledge, which practice Plaintiffs characterize as "statement suppression." (Id. ¶¶ 65-66.) Merchants who complain and demand full statements are often sent "summary" statements, which are not itemized. (Id. ¶ 68; see also Kosie Summary Statement (Dkt. 36-9).) Meanwhile, dissatisfied merchants who wish to

---

[2] Plaintiffs characterize the Program Guide attached to their complaint as a "sample" because the Program Guide is updated periodically and, thus, different terms may apply to each Plaintiff. (See CCAC ¶ 48 & n.2.) Defendant has attached what it asserts are the governing Program Guides for each Plaintiff to an affirmation submitted with its motion. (See ASBC Guide (Dkt. 31-8); HAWM Guide (Dkt. 31-9); DBKA Guide (Dkt. 31-10); Inkwel Guide (Dkt. 31-11); ALO Guide (Dkt. 31-12); Choi's LLC Guide (Dkt. 31-13).) After reviewing each of these documents, the court has determined that there are no material differences among the provisions relevant to this motion contained in each. Accordingly, the court will refer only to the guide attached to Plaintiff's complaint.

terminate their contracts are told "to send a letter requesting termination without being told that an early termination fee w[ill] be seized from their checking account." (CCAC ¶ 73.)

### 2. Individual Factual Allegations

#### a. HAWM

Plaintiff HAWM is a Christian ministry led by Dr. Dorothy Hooks that focuses primarily on providing spiritual outreach and counseling to abused women. (Id. ¶ 14.) In September 2014, Dr. Hooks contacted PNC Bank (where she conducted her regular banking business) to inquire about merchant services for HAWM so that it could accept credit card payments. (Id. ¶¶ 98-99.) Dr. Hooks advised Defendant's sales agent Randi McKenna that she did not want to be subject to any monthly fees as she did not anticipate using the account frequently. (Id. ¶ 100.) Plaintiffs allege that Ms. McKenna specifically told Dr. Hooks that HAWM would only be required to pay fees if and when it actually accepted card payments. (Id.)

Ms. McKenna then sent Dr. Hooks an Application for signature. (Id. ¶ 101.) Dr. Hooks advised Ms. McKenna that the amounts listed for HAWM's annual sales and card transaction figures were grossly inflated relative to HAWM's actual sales. (Id. ¶¶102-103; see also HAWM Appl. at ECF p. 1.) However, Ms. McKenna allegedly told Dr. Hooks that these figures were "'just standard' and not to worry about it." (CCAC ¶ 103.) Based on these representations, Dr. Hooks signed the Application. (Id. ¶ 105.)

In June 2016, approximately 21 months after signing up with Defendant, Dr. Hooks noticed that Defendant had deducted $19.50 from her bank account the previous month, even though HAWM had not accepted any card payments that month. (Id. ¶ 109.) Dr. Hooks contacted both Ms. McKenna and Defendant's customer service line, neither of whom explained the basis for the fee. (Id. ¶ 110.) Ultimately, Dr. Hooks spoke with Mark Blackstock (whom

Plaintiffs characterize as "Defendant's representative") who advised Dr. Hooks that the fee was a monthly minimum fee imposed because HAWM had not been processing the volume of transactions set forth in its Application. (Id.) Mr. Blackstock informed Ms. Hooks that Defendant had sent her a letter the previous February advising that the fee would be imposed (which Dr. Hooks alleges not to have received). (Id. ¶ 112.) Mr. Blackstock further advised Dr. Hooks that the $19.50 monthly fee would be assessed until the expiration of her Merchant Agreement in September 2017, and that, if Dr. Hooks elected to terminate the agreement, she would be liable for an early termination fee. (Id. ¶¶ 114-115.) Plaintiffs allege that this is the first time that Dr. Hooks learned that the Merchant Agreement had a term of three years and an early termination fee. (Id. ¶ 116.)

In the months and weeks that followed, Dr. Hooks filed written complaints with unnamed "federal and state authorities," many of which she claims "were served on Defendant within 60 days of Defendant" assessing the disputed $19.50 fee. (Id. ¶¶ 117-118.) At some point thereafter, Defendant deducted an additional $109.95 fee from Dr. Hooks account, which Plaintiffs believe to have been Defendant's "discretionary 'annual fee.'" (Id. ¶ 123.)

At this point, Dr. Hooks contacted her PNC Bank branch manager and obtained a partial refund and an early termination without having to pay the early termination penalty. (Id. ¶ 125.)

    b.    Inkwel

Plaintiff Inkwel is a small business that sells the illustrations of its founder and proprietor, Mr. Kelwin Warren. (Id. ¶ 15.) Mr. Warren established the business in or around October 2015 and, at that time, contacted Defendant about accepting credit card payments. (Id. ¶¶ 129-131.) Mr. Warren advised the sales agent with whom he spoke that Inkwel's sales would be "low and erratic," and was allegedly told that Defendant would sign it up for a "program that

would be appropriate for [] a new business . . . where fees were only assessed when the service was used." (Id. ¶ 131.)

Mr. Warren's business "never got off the ground and [he] never had the need to accept any credit card payments." (Id. ¶ 136.) Consequently, though Mr. Warren executed an Application, he never formally activated Inkwel's account, nor did he process any transactions with Defendant. (Id.) Defendant nonetheless began deducting approximately $80 per month from Inkwel's account, which came as a surprise to Mr. Warren. (Id. ¶¶ 137-38.)

On May 6, 2016, Mr. Warren received a letter from Defendant informing him that Inkwel's account would be terminated due to non-activity "and all applicable termination fees [would] apply." (Id. ¶ 139.) Mr. Warren called Defendant to complain, telling Defendant's customer service representative that he had not been informed that he would be required to use the account, that the contract had a three-year term, nor that he would be liable for an early termination fee. (Id. ¶ 140.) Thereafter, Defendant deducted the remaining funds in Inkwel's account in satisfaction of the early termination fee and closed the account. (Id. ¶ 142.)

c.    *ASBC*

Plaintiff ASBC is a Florida-based provider of skincare and therapy products operated as a sole proprietorship by Ms. Anita Phillips. (Id. ¶ 16.) In or around September 2012, Ms. Phillips was visited at her place of business by a sales agent of Defendant coincidentally named Don Phillips. (Id. ¶ 156.) Mr. Phillips soon sent Ms. Phillips an Application; the Application, however, contained several pricing terms different from what the two had discussed, including additional "start-up" and monthly fees. (Id. ¶ 157.) Upon Ms. Phillips's request, Mr. Phillips scratched out these fees and, thereafter, Ms. Phillips signed the Application and began using Defendant's services. (Id. ¶ 158; see also ASBC Appl. (Dkt. 36-5) at ECF p. 3.)

7

Ms. Phillips expected to receive monthly statements from Defendant but, at least initially, she did not. (CCAC ¶¶ 159-160.) Ms. Phillips nonetheless monitored ASBC's account and, because the amounts deducted "did not seem unreasonable, . . . [she] assumed Defendant was operating pursuant to the contract. (Id. ¶ 159.) However, in or around May 2013, Ms. Phillips contacted Mr. Phillips to inquire about debits that she believed to be "unusually high." (Id. ¶ 161.) Mr. Phillips advised her that the fees were high because most of ASBC's transactions "were being routed to the most expensive rates specified on the Application." (Id. ¶ 162.) Mr. Phillips also provided Ms. Phillips with ASBC's merchant statements to date, and promised her that she would receive monthly statements in the future. (Id. ¶¶ 162-163.) On May 3, 2013, Ms. Phillips sent Mr. Phillips a written inquiry regarding certain transaction fees that had been charged within the past 60 days and requested a rebate, which did not materialize, and ABSC's card transactions continued to be processed at the highest rates. (Id. ¶¶ 163-166, 181.)

In addition to the allegedly intentional manipulation of transactions to route them to more expensive tiers, Plaintiffs allege that Defendant charged ASBC additional improper fees. For example, beginning in November 2014, ASBC was charged a monthly fee of $6.99 for the statements it was receiving, even though this was one of the fees that had been struck out by Mr. Phillips on ASBC's Application. (Id. ¶¶ 174-175; ASBC Appl. at ECF p. 3.) In addition, ASBC was charged an annual fee of $109.95 in October of 2013, 2014, and 2015, which Plaintiffs allege was not assessed "with at least 30 days advance written notice" nor needed "to defray the cost of necessary systems technology upgrades, communication requirements and reporting" as required by the Merchant Agreement. (CCAC ¶¶ 170-173; see also ASBC Appl. at ECF p. 4.) Ms. Phillips contacted Defendant's customer service line each year to complain about the annual fees: in 2013, she was promised a partial refund that Plaintiffs allege was never paid (CCAC

¶ 182); in 2014, she was promised—and received—a partial refund and allegedly told that the fee would not be charged again (id. ¶ 183); and in 2015, she was promised—and received—a full refund of the annual fee (id. ¶ 185).

Plaintiffs allege that Ms. Phillips made most of her complaints telephonically on reliance on the representation in some of her monthly statements that she should "contact [Defendant's] Customer Help Desk at 1-800-742-5030" if she had any questions regarding the annual fee or her merchant account. (Id. ¶ 186.) In December 2015, Ms. Phillips, advised Defendant that she wished to cancel her account. (Id. ¶¶ 192-193.)

### d. DBKA

Plaintiff DBKA is an Ohio-based business that provides a broad range of land surveying services. (Id. ¶ 17.) On May 13, 2015, DBKA's owner, Mr. Robert Kosie, signed an Application for DBKA in which DBKA agreed to pay, inter alia, approximately 3.0% of each transaction in processing fees as well as a monthly "Payeezy Gateway" fee of $10. (Id. ¶ 195; see also DBKA Appl. (Dkt. 36-6) at ECF p. 3.) Plaintiffs allege that Mr. Kosie did not receive monthly statements from Defendant as he had expected; however, he "watched [DBKA's] bank account closely" for several months and believed that the fees assessed by Defendant were in line with what he anticipated when signing the application. (CCAC ¶ 196.) Thereafter, Mr. Kosie ceased carefully monitoring DBKA's account. (Id. ¶ 199.)

Beginning in late 2016, however, Mr. Kosie noticed what he believed to be extremely high fees, including "massive" deductions during months in which DBKA had not processed any card transactions. (Id.) In February 2017, after receiving what he believed to be an unsatisfactory explanation from Defendant's customer service regarding the basis for these fees, Mr. Kosie elected to cancel DBKA's account with Defendant. (Id. ¶¶ 200-201.) The customer

service representative with whom Mr. Kosie had spoken advised him to submit a notice of his intent to cancel in writing and allegedly agreed that the agreement would terminate upon Defendant's receipt of said notice. (Id. ¶ 201.) Mr. Kosie sent the letter in February 2017, but Defendant continued to charge DBKA monthly fees for the next two months and, on April 20, 2017, deducted an additional $325 early termination fee from DBKA's account. (Id. ¶¶ 202-203.)

> e. *ALO*

Plaintiff ALO is a Wisconsin family law practice operated by solo practitioner Bonnie Abramoff Schmalzer. (Id. ¶ 19.) In or around 2014, Ms. Schmalzer (through her legal assistant) reached out to Defendant to inquire about credit card processing and was provided with an Application. (Id. ¶ 208.) Ms. Schmalzer contacted the sales agent to address errors in the Application, including the fact that the figures setting forth ALO's projected volume of credit card transactions were higher than what she actually anticipated. (Id. ¶ 209.) Plaintiffs allege that the sales agent told Ms. Schmalzer that "no correction [to these figures] was necessary." (Id.) Ms. Schmalzer also expressed concern that "the Application was difficult to understand." (Id. ¶ 210.) In response, the sales agent allegedly advised Ms. Schmalzer that ALO would pay a specific set of fees on transactions and that "none of the other fees on the fee transaction charts will come up for [her]." (Id.) Ms. Schmalzer signed the Application on or around August 15, 2014. (Id. ¶¶ 211-212; ALO Appl. (Dkt. 36-7).)

In late February 2018, Ms. Schmalzer contacted Defendant's customer service department to inquire as to why she had not been receiving regular monthly statements. (CCAC ¶ 216.) She obtained access to all monthly statements and was advised that she would receive them by email moving forward. (Id. ¶ 217.) Plaintiffs allege that these statements reveal

"multiple instances of overcharges and multiple increases in rates" unauthorized by the Merchant Agreement. (Id.) In particular, Plaintiffs allege that ALO was charged a $109.95 annual fee in September of each year between 2015 and 2018 but that this fee was not assessed "with at least 30 days advance written notice" nor needed "to defray the cost of necessary systems technology upgrades, communication requirements and reporting" as required under the Merchant Agreement. (Id. ¶¶ 222-228; see also ALO Appl. at ECF p. 4.)

       *f.*    *Choi's LLC*

Plaintiff Choi's LLC is a small family-owned purveyor of beer and sandwiches located in Philadelphia. (CCAC ¶ 18.) Choi's LLC enrolled in Defendant's card processing service in July 2017. (Id. ¶ 231.) Plaintiffs allege that Choi's LLC was enrolled in a three-year term despite its specific statement to Defendant's sales agent that it did not want a long-term commitment. (Id. ¶¶ 232-233.) Plaintiffs further allege that Choi's LLC could not "reasonably discern the existence" of the three-year term before it began doing business with Defendant (id. ¶ 234), although Choi's LLC's Application contains bold-faced language immediately above the signature line stating that the Merchant Agreement has a three-year term (Choi's LLC Appl. (Dkt. 36-8) at ECF p. 4).

Unlike the other plaintiffs, Choi's LLC actually did receive and review its merchant statements on a monthly basis. (Id. ¶ 235.) Choi's LLC also "made repeated calls" to Defendant's customer service department seek information and/or attempt to obtain refunds when it encountered charges that it did not understand. (Id. ¶ 236.) Frustrated by what it perceived as a general lack of helpfulness from customer service, Choi's LLC filed a complaint with the Office of the Comptroller of Currency, which forwarded a copy to Defendant. (Id.)

Notwithstanding Choi LLC's complaints, Defendant has continued to assess certain fees, including the $109.95 annual fee, most recently assessed in September 2018. (Id. ¶ 237.) Like Plaintiffs ASBC and ALO, Plaintiffs allege that this fee was neither assessed on Choi's LLC with 30 days advance written notice nor "needed to defray 'necessary' costs." (Id. ¶¶ 237-240.)

## B.    Procedural History

Plaintiffs HAWM and Inkwel filed a class action complaint against Defendant on October 26, 2017. (See Compl. (Dkt. 1).) On February 6, 2018, HAWM and Inkwel filed an amended complaint joining DBKA and ASBC as plaintiffs. (See Am. Compl. (Dkt. 12).) Separately, on October 22, 2018, Plaintiffs Choi's LLC and ALO filed a class action complaint, also before the undersigned. (See Compl. (No. 18-cv-5906, Dkt. 1).) On November 5, 2018, the separate actions were consolidated on consent of the parties (see Nov. 5, 2018 Order) and a consolidated class action complaint followed on November 21, 2018 (see Consol. Class Action Compl. (Dkt. 24)). On February 6, 2019, Defendant filed a motion to dismiss all claims against it and to strike the jury demand. (See Mot.) Subsequently, on August 21, 2019, while the motion was pending, Plaintiffs filed a further amended complaint deleting certain paragraphs, which for the purpose of resolving the motion the court deemed effective nunc pro tunc to November 21, 2018. (See Aug. 20, 2019 Order; CCAC.)

Plaintiffs assert claims, individually and on behalf of the putative class, for breach of contract and breach of the implied covenant of good faith and fair dealing, fraudulent inducement, unlawful termination penalties and conversion, and unjust enrichment.

## II.    LEGAL STANDARD

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 111-12

(2d Cir. 2007) (per curiam). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

In evaluating a motion to dismiss, a court may consider documents central to a plaintiff's claim and documents sufficiently referred to in the complaint. See King v. City of New York, No. 12-CV-2344 (NGG), 2014 WL 4954621, at *7-8 (E.D.N.Y. Sept. 30, 2014) (citing Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (holding that courts may consider an extrinsic document when the complaint "relies heavily upon its terms and effect"). The purpose of this rule is to "prevent[] plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." King, 2014 WL 4954621, at *8 (quoting Global Network, 458 F.3d at 157).

## III. DISCUSSION

For the reasons that follow, the court GRANTS Defendant's motion to dismiss the fraudulent inducement, conversion, and breach of the implied covenant of good faith and fair dealing claims brought by all Plaintiffs; the court GRANTS Defendant's motion to dismiss the unjust enrichment claims brought by HAWM, ASBC, ALO, and Choi's LLC, and DENIES the motion to dismiss the unjust enrichment claims brought by Inkwel and DBKA; the court further GRANTS Defendant's motion to dismiss the breach of contract claims brought by HAWM, ALO, Inkwel, DBKA, and Choi's LLC, and DENIES the motion to dismiss the breach of

contract claim brought by ASBC; finally, the court GRANTS Defendant's motion to strike the jury demand.

**A.    Fraudulent Inducement**

Plaintiffs bring a claim for fraudulent inducement based on alleged misrepresentations and failure to disclose certain information to Plaintiffs at the time each signed their respective Applications. As set forth below, however, Plaintiffs' allegations are insufficient to state a claim for fraudulent inducement under New York law.

1.    Affirmative Misrepresentations

To plead a claim of fraudulent inducement to contract premised on an affirmative misrepresentation under New York law, a plaintiff must first allege the basic elements of a fraud claim, i.e., "a misrepresentation of material fact, which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party, and injury." ISS Action, Inc. v. Tutor Perini Corp., 95 N.Y.S.3d 298, 301 (N.Y. App. Div. 2019) (citations omitted). Because Plaintiffs have failed to plead justifiable reliance, their fraudulent inducement claims cannot stand.

Plaintiffs identify a litany of misrepresentations allegedly made by Defendant's sales agents. (See Pls. Mem. in Opp'n to Mot. ("Opp.") (Dkt. 28) at 17 (citing CCAC ¶¶ 48-61).) The problem for Plaintiffs, however, is that nearly all of the misrepresentations they have identified are misrepresentations of specific contractual terms. (Compare, e.g., CCAC ¶¶ 51, 53, 55 (merchants were told that there were no monthly minimum processing requirements, that inflated anticipated processing numbers were "just standard," and that merchants would only be charged if and when transactions were processed), with Guide § 11.3 (fees are based on assumptions associated with anticipated processing volume and may be adjusted if actual volume is not as

expected).) And it is a longstanding rule of New York law that a party cannot rely on a misrepresentation if its falsity would be revealed by the exercise of ordinary diligence such as, in this case, by reading the agreement. See ISS Action, 95 N.Y.S.3d at 301-02 ("If the facts represented are not peculiarly within the party's knowledge, and the other party has the means available to him or her of knowing . . . the truth . . . , he or she will not be heard to complain that he or she was induced to enter into the transaction by misrepresentations." (quoting Schumaker v. Mather, 30 N.E. 755, 757 (N.Y. 1892) (alterations adopted) (ellipses added)); see also Minuteman Press Int'l v. Matthews, 232 F. Supp. 2d 11, 15-16 (S.D.N.Y. 2002) (cause of action for fraudulent inducement did not lie where terms of contract contradicted alleged false representation).

      2.    Fraudulent Concealment

Plaintiffs alternatively premise their fraudulent inducement claims on Defendant's alleged failure to provide a copy of the Guide to Plaintiffs until after they had signed their respective Applications. (See CCAC ¶¶ 48-50.) This alleged concealment, however, is equally insufficient to state a claim for fraudulent inducement.

New York law does not recognize a cause of action for fraudulent concealment unless there is an independent duty of disclosure by the party alleged to have concealed information. See, e.g., Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291-92 (2d Cir. 2006) ("Instead of an affirmative misrepresentation, a fraud cause of action [under New York law] may be predicated on acts of concealment where the defendant had a duty to disclose material information." (citation omitted) (alteration adopted)). Such a duty arises either in the context of a fiduciary relationship or where the party alleged to have concealed information possesses superior knowledge not discoverable by its counterparty through the exercise of reasonable diligence.

See Tears v. Boston Sci. Corp., 344 F. Supp. 3d 500, 515 (S.D.N.Y. 2018). Plaintiffs, however, do not allege any facts that could conceivably support an assertion that Defendant owed them fiduciary duties, and the existence of the Guide is set forth in the Application documents that each Plaintiff reviewed and signed. As such, a party exercising reasonable diligence would have read the Application and been aware of the Guide prior to signing.

Further, under New York law, the obligation imposed on a contracting party to read an agreement prior to signing it is not excused by the fact that the agreement was not made available to her. See Marciano v. DCH Auto Grp., 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014) (collecting cases). Accordingly, where, as here, a party signs a document containing language both alerting her to the existence of additional terms and to the fact that her signature binds her to such terms, courts applying New York law will uphold the agreement even where she was never provided with a complete copy to review. See Burton v. Label, LLC, 344 F. Supp. 3d 680, 693-94 (S.D.N.Y. 2018) (under New York law, plaintiff was bound by entire agreement even though he was only provided signature page at time of execution); Vulcan Power Co. v. Munson, 932 N.Y.S.2d 68, 69 (N.Y. App. Div. 2011) ("A signer's duty to read and understand that which it signed is not diminished merely because the signer was provided with only a signature page." (citation and internal quotation marks omitted) (alteration adopted)).

Accordingly, Plaintiffs' fraudulent inducement claims are dismissed.

**B.      Unjust Enrichment**

Plaintiffs advance a claim for unjust enrichment based on Defendant's involuntary deduction of the contractual early termination fee ("ETF")—which Plaintiffs contend is void as a penalty—from their settlement accounts. (See CCAC ¶ 300.)[3] While Plaintiffs do not specify on

---

[3] Plaintiffs plead this claim generally (with the ETF provided only as an illustrative example) and seek recovery based on any sums received by Defendant pursuant to a provision of the Merchant Agreement that has been

whose behalf this claim is brought, only DBKA and Inkwel allege to have paid the early termination fee (see id. ¶¶ 140, 202-204). The court therefore dismisses this claim insofar as HAWM, ASBC, Choi's LLC, and ALO purport to assert it.

For the following reasons, the court holds that DBKA and Inkwel have plausibly alleged that the ETF constitutes an unlawful penalty and, accordingly, denies Defendant's motion to dismiss the unjust enrichment claims brought by these Plaintiffs.

To state a claim for unjust enrichment under New York law, a plaintiff must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Kilgore v. Ocwen Loan Servicing, LLC, 89 F. Supp. 3d 526, 537 (E.D.N.Y. 2015) (quoting Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d. Cir. 2006)). Because unjust enrichment sounds in quasi-contract, the existence of a valid contract between the parties ordinarily precludes recovery in unjust enrichment. See, e.g., Chiarelli v. Nissan N. Am., Inc., No. 14-cv-4327 (NGG), 2015 WL 5686507, at *18 (E.D.N.Y. Sept. 25, 2015) ("Under New York law, where a valid contract governs the subject matter in a lawsuit, a plaintiff may not recover in quasi-contract, and it is appropriate to dismiss a claim for unjust enrichment." (citation and internal quotation marks omitted) (alteration adopted)). However, if a plaintiff plausibly alleges that a liquidated damages provision is unenforceable as a penalty, she may bring a claim in unjust enrichment to recover any sums involuntarily paid pursuant to that provision. See Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 306-08 (E.D.N.Y. 2010) (merchant could bring unjust enrichment claim against defendant credit card processor challenging contractual ETF as penalty where

---

"deemed ineffective, inapplicable, void, illegal, or unenforceable" (CCAC ¶ 300). However, because the court dismisses Plaintiffs' fraudulent inducement claims and corresponding prayer for rescission of the Merchant Agreement, the court construes this claim as being asserted only with regard to the ETF.

defendant had automatically debited ETF from account); Agerbrink v. Model Serv. LLC, 155 F. Supp. 3d 448, 458-60 (S.D.N.Y. 2016) (plaintiff could bring unjust enrichment claim to recover liquidated damages where plaintiff had plausibly challenged validity of agreement). As noted above, Plaintiffs DBKA and Inkwel have alleged that the ETF was involuntarily debited from their respective accounts; accordingly, the question that the court must resolve is whether they have plausibly alleged that the ETF is an unenforceable penalty.

Under New York law, a contractual liquidated damages clause is unenforceable if it "does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere added spur to performance." Breathe LLC v. White Fox Ventures, 268 F. Supp. 3d 510, 514-15 (S.D.N.Y. 2017) (quoting Agerbrink, 196 F. Supp. 3d at 417). Accordingly, New York courts uphold liquidated damages provisions only where "(1) actual damages are difficult to determine and (2) the amount of damages awarded pursuant to the clause is not clearly disproportionate to the potential loss." LG Capital Funding v. 5Barz Int'l, 307 F. Supp. 3d 84, 101 (E.D.N.Y. 2018) (citation omitted). "In both cases, the court must look to the anticipated loss discernible at the time of contracting and not the actual loss incurred by the breach to determine whether liquidated damages are reasonable or whether damages are capable of calculation." AXA Inv. Mgrs. UK Ltd v. Endeavor Capital Mgmt. LLC, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012) (internal quotation marks and citation omitted); see also Walter E. Heller & Co. v. Am. Flyers Airline Corp., 459 F.2d 896, 898 (2d Cir. 1972) ("The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into.").

Further, while the enforceability of a liquidated damages clause is a question of law for the court to resolve, the party seeking to avoid enforcement of the clause ultimately bears the

burden of showing the inapplicability of one or both of the foregoing conditions. See JMD Holding Corp. v. Congress Fin. Corp., 828 N.E.2d 604, 609 (N.Y. 2005); Marvel Entm't, Inc. v. Kellytoy (USA), 769 F. Supp. 2d 520, 527 (S.D.N.Y. 2011). However, at this stage of the proceedings, Defendant bears the burden of showing that Plaintiffs have not plausibly alleged that the ETF amounts to an unenforceable penalty.

Plaintiffs allege, in brief, that at the time they signed their Merchant Agreements, Inkwel and DBKA agreed to pay no more than $0 and $10 in monthly fees respectively. (CCAC ¶¶ 133, 195-203.) Therefore, Plaintiffs contend, the damages Defendant might expect to incur if either Inkwel or DBKA cancelled its Merchant Agreement prior to the expiration of the three-year term would be $0 in Inkwel's case or $10 multiplied by the months remaining in the term in DBKA's case. (Id. ¶ 274; see also Opp. at 31-34.) Thus, Plaintiffs argue, damages were readily ascertainable at the time of contract formation and, as such, the ETF provided for in the Merchant Agreement ($25 per month for the number of months remaining at the time of cancellation) is clearly disproportionate to these damages. (See id.)

Defendant emphasizes that the Merchant Agreements that Inkwel and DBKA signed both contain stipulations that the early termination fee represented a "reasonable pre-estimate of Servicer's probable loss." (See Def. Mem. in Supp. of Mot. ("Mem.") (Dkt. 27-1) at 26-29; Guide pt. A.3.) Defendant further notes that the term "Servicer" as used within the agreement refers not only to itself but also to PNC Bank and argues, without elaboration, that "the CCAC makes no mention of the probable loss to the Bank upon Plaintiffs' breach." (Mem. at 28.)

While Plaintiffs will ultimately bear the burden on this issue, Defendant has not met its burden on this motion. DBKA and Inkwel both allege precisely how the ETF is unreasonable as applied to them, and Defendant fails to substantively respond to these allegations. Further, the

19

court is unaware of any legal support for Defendant's argument that a party's contractual stipulation that a liquidated damages provision constitutes a reasonable pre-estimate of damages precludes any subsequent challenge to the enforceability of that provision. Moreover, accepting Defendant's argument would eviscerate the prohibition on punitive liquidated damages provisions; indeed, under Defendant's theory, any stipulation of damages—no matter how unreasonable or severe—could be insulated from judicial inquiry by dint of careful drafting.

Further, Defendant's argument that this claim must be dismissed because DBKA and Inkwel do not plead compliance with the Merchant Agreement's notice-of-dispute provision (Mem. at 17; Guide § 11.10) is without merit. Should the ETF be deemed a penalty, Defendant's deduction of the ETF from DBKA and Inkwel's accounts would not be governed by the Merchant Agreement and, as such, the notice-of-dispute provision would not apply.

Accordingly, the court denies Defendant's motion as to DBKA and Inkwel's unjust enrichment claims and grants the motion as to the remaining Plaintiffs' unjust enrichment claims.

### C.    "Unlawful Termination Penalties and Conversion"

Plaintiffs also assert claims for conversion based on Defendant's deduction of the contractual early termination fee. (See CCAC ¶¶ 271-285.) The court is not aware of (and Plaintiffs have not provided) any precedent for the proposition that a sum taken in accordance with a liquidated damages provision subsequently adjudged unenforceable may be recovered in an action for conversion. Moreover, the recovery sought by this cause of action is duplicative of that sought by Plaintiffs' claim for unjust enrichment. See Stanley Works Israel Ltd. v. 500 Grp., Inc., 332 F. Supp. 3d 488, 514 (D. Conn. 2018) (dismissing conversion claim as duplicative under New York law because "if Plaintiff prevails on its breach of contract claim—or, in the

alternative, its unjust enrichment claim—it will be fully compensated"). Consequently, the court grants Defendant's motion to dismiss Plaintiffs' conversion claims.

**D.    Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

The court now turns to the most complex of Plaintiff's claims. For the following reasons, the court grants the motion to dismiss the breach of contract claims brought by HAWM, DBKA, Inkwel, ALO, and Choi's LLC, and denies the motion to dismiss the breach of contract claim brought by ASBC. The court further grants the motion to dismiss all Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing.

1.    The Merchant Agreement's Notice-of-Dispute Provision

In urging this court to dismiss these claims, Defendant relies heavily on Section 11.10 of the Merchant Agreement, which requires a merchant to dispute charges in writing and within 60 days of such charge. (See Mem. at 13-17.) The clause states that if a merchant does not comply with this notice requirement, Defendant "shall have no obligation to investigate or effect any such adjustments." (See Mem. at 13-17; Guide § 11.10.) As the Second Circuit recently noted when interpreting virtually identical language in a similar agreement, this language suffices to create a condition precedent under New York law, and Plaintiffs' failure to comply with this term precludes any action for breach. See Zam & Zam Supermarket v. Ignite Payments, 736 F. App'x 274, 277 (2d Cir. 2018) (summary order) ("[T]he notice-of-claim provision uses unmistakeable language of condition—explaining that if a merchant fails to dispute a charge within sixty days, then defendants shall have no legal obligations concerning the adjustment of those charges—so as to preclude liability for charges disputed outside the sixty-day period." (emphasis in original)).

In response, Plaintiffs raise four arguments: (1) their fraudulent inducement claims, if successful, would render the notice-of-dispute provision void; (2) compliance with the condition should be excused because Defendant "suppressed" their merchant statements; (3) Defendant waived compliance by including language in certain merchant statements directing Plaintiffs to contact Defendant's customer service hotline if they had questions about the annual fee or their merchant accounts (see, e.g., ALO Aug. 2018 Stmt (Dkt. 36-11) at ECF p. 2); and (4) in any event, Plaintiffs have adequately pleaded compliance. (See Opp. at 19-25.)

Plaintiffs' first contention is, of course, rendered moot by the court's dismissal of their fraudulent inducement claims. Plaintiffs' second contention is unpersuasive given that, even setting aside the conclusory nature of the allegations regarding Defendant's "suppression" of statements (which allegations are belied by the fact that none of the applications that Plaintiffs reviewed and signed indicate that they wished to receive such statements except that of Choi's LLC, which did receive statements (see HAWM Appl. at ECF p. 3; Inkwel Appl. at ECF p. 3; ASBC Appl. at ECF p. 3; DBKA Appl. at ECF p. 3; ALO Appl. at ECF p. 3; Choi's LLC Appl. at ECF p. 3; CCAC ¶ 235)), all Plaintiffs allege that they actively monitored their bank accounts for activity and, as such, had sufficient information to challenge any charges they felt were unwarranted. Cf. Benex LC v. First Data Merch. Servs. Corp., No. 14-cv-6393 (JS), 2016 WL 6683475, at *6 (E.D.N.Y. Nov. 14, 2016) (declining to excuse compliance with nearly identical contractual condition where Plaintiff had "all the information necessary . . . to provide the required notice").

The court will address Plaintiffs' remaining two arguments below.

*a.    Waiver*

Plaintiffs argue that Defendant waived its right to insist that charges be disputed in writing within 60 days, both as a general proposition and specifically with regard to the annual fee. While the court does not believe that Defendant generally waived compliance with this condition, it concludes that Plaintiffs have plausibly stated a claim that Defendant waived its right to insist that a timely dispute relating to the annual fee be in writing.

Under New York law, a party to a contract may waive a contractual right by action or inaction. See, e.g., Optima Media Grp. Ltd. v. Bloomberg L.P., 383 F. Supp. 3d 135, 150 (S.D.N.Y. 2019). Waiver, however, is not "lightly presumed" and requires manifestation of "an intent not to claim a purported advantage." Williams v. Buffalo Pub. Sch., 758 F. App'x 59, 63 (2d Cir. 2018) (summary order) (citations omitted); see also Fahs Constr. Grp. v. New York, 999 N.Y.S.2d 244, 246 (N.Y. App. Div. 2014) (waiver must be "explicit, unmistakeable, and unambiguous" (citations omitted)). Whether a party has manifested such intent is typically a question of fact. Williams, 758 F. App'x at 63; see also Fundamental Portfolio Inc. v. Tocqueville Asset Mgmt., 850 N.E.2d 653, 658 (N.Y. 2006) ("Generally, the existence of an intent to forgo such a right is a question of fact.").

Plaintiffs first contend that Defendant waived its right to enforce the notice-of-dispute provision by including language directing Plaintiffs to contact Defendant's customer service line with any "questions regarding the [annual] fee or your merchant account" on each statement notifying Plaintiffs that the annual fee would be assessed. (Opp. at 22-23.) Second, Plaintiffs argue that the fact that Defendant maintained a customer service line through which it fielded merchant complaints and, in some instances, refunded disputed charges also amounts to a waiver. (Id. at 23.) Defendant answers these contentions by arguing that any finding of waiver

is precluded by the Merchant Agreement's "no-waiver" clause, and that, even if a waiver were found, a separate clause providing that "[a] party's waiver of a breach of any term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or another term and condition" (Guide § 32.6) would necessarily limit its scope. (Mem. at 16-17.)

Unfortunately for Defendant, under New York law, a no-waiver clause "does not preclude a waiver of contractual rights." Williams, 758 F. App'x at 63 (citing, inter alia, TSS-Seedman's, Inc. v. Elota Realty Co., 531 N.E.2d 646, 648 (N.Y. 1988)); see also Kenyon & Kenyon v. Logany, LLC, 823 N.Y.S.2d 72, 74 (N.Y. App. Div. 2006) ("The existence of a nonwaiver clause does not in itself preclude waiver of a contract clause." (citations omitted) (alteration adopted)). Moreover, because Plaintiffs have alleged what amounts to an ongoing course of conduct, assuming these acts plausibly allege a waiver, the distinction between a limited waiver and a waiver in perpetuity is of no moment.

The question remains, however, whether the conduct alleged by Plaintiffs plausibly sets forth waiver of the notice-of-dispute provision by Defendant. The court is not persuaded that the mere fact that Defendant maintained a customer service line plausibly alleges such a waiver. As discussed above, under New York law, a waiver cannot be found absent conduct that is "explicit, unmistakeable, and unambiguous," Fahs Constr. Grp. 999 N.Y.S.2d at 246. Defendant's maintenance of a customer service line, without more, cannot be understood to imply an intent on behalf of Defendant to relinquish a contractual right. Indeed, New York courts have found similarly indirect behavior insufficient to establish a waiver. See Ridley Elec. Co., Inc. v. Dormitory Auth. of State, 60 N.Y.S.3d 551, 555-56 (N.Y. App. Div. 2017) (party's offer of partial payment of claim not noticed in compliance with contractual provision did not amount to waiver).

Defendant's specific invitation to customers to contact customer service with questions regarding the annual fee presents a closer call. As Defendant notes, the term "questions" does not necessarily embrace formal fee disputes. (Mem. at 16.) However, it would not be unreasonable to infer that Defendant's invitation for merchants to contact it telephonically to discuss the annual fee would be understood to include disputes related to the annual fee, particularly given that Defendant, aware of this invitation, offered at least some merchants who called partial or total refunds of the annual fee (see CCAC ¶¶ 164-185). As such, and drawing all inferences in Plaintiffs' favor, this language plausibly states a claim that Defendant waived compliance with the notice-of-dispute provision's requirement that notice be in writing as to disputes related to the annual fee. Cf. Kenyon & Kenyon, 823 N.Y.S.2d at 74 (defendant's "failure to insist on [written] notice . . . while acting as if it had accepted the oral [notice] . . . knowing plaintiff's action in reliance on defendant's conduct, constituted a waiver of any right to insist on written notice").

> b.    Rule 9(c)

Having concluded that compliance with the notice-of-dispute provision is required except as to disputes concerning the annual fee (for which prompt telephone notice will suffice), the court will now determine what Plaintiffs must allege in order to sufficiently plead such compliance. The pleading of conditions precedent is governed by Federal Rule of Civil Procedure 9(c), which provides, in relevant part, that "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." Plaintiffs contend that the plausibility standard that broadly governs federal pleading, see supra Section II, does not apply to this rule. (Opp. at 21 (citing, inter alia, Hildebrand v. Allegheny Cty., 757 F.3d 99, 112 (3d Cir. 2014) ("The pleading of conditions precedent falls outside the

strictures of <u>Iqbal</u> and <u>Twombly</u>.")).) As such, Plaintiffs argue, their allegation that they "have

performed all conditions precedent to suit" (CCAC ¶ 267) is sufficient to discharge their burden

under Rule 9(c). (Opp. at 21.)

As the Second Circuit recently acknowledged, the applicability of the plausibility

standard to Rule 9(c) is a question that it has yet to resolve. <u>See</u> <u>Zam & Zam</u>, 736 F. App'x at

276 ("[W]e have not interpreted Rule 9(c) since the Supreme Court's adoption of the plausibility

pleading standard."). However, the Second Circuit has held that the plausibility standard does

apply to Rule 9(b), which by its terms permits "[m]alice, intent, knowledge, and other conditions

of a person's mind" to be "alleged generally." <u>See</u> <u>Biro v. Conde Nast</u>, 807 F.3d 541, 544-45

(2d Cir. 2015). Given the nearly identical language employed in Rule 9(c), the court sees no

reason to accord it a different interpretation. <u>See</u> <u>Dervan v. Gordian Grp. LLC</u>, No. 16-cv-1694

(AJN), 2017 WL 819494, at *5 (S.D.N.Y. Feb. 28, 2017) ("The Court sees no principled basis on

which to afford Rule 9(c)—an adjacent subsection whose structure substantially mirrors that of

Rule 9(b)—a divergent reading."); <u>see also</u> <u>Napster, LLC v. Rounder Records Corp.</u>, 761 F.

Supp. 2d 200, 208-09 (S.D.N.Y. 2011) (rejecting allegation that all conditions precedent had

been performed as "merely a legal conclusion"). As such, Plaintiffs must plausibly plead

compliance with the notice-of-dispute provision except as to their claims regarding the annual

fee.

    2.   <u>Breach of Contract</u>

To plead a claim for breach of contract under New York law, a plaintiff must allege "(1)

the existence of a contract, (2) performance by the party seeking recovery, (3) [breach] by the

other party, and (4) damages attributable to the breach." <u>RCN Telecon Servs., Inc. v. 202 Centre</u>

<u>St. Realty LLC</u>, 156 F. App'x 349, 350-51 (2d Cir. 2005) (summary order) (citation omitted).

Where the contract at issue contains an express condition precedent to recovery, that condition "must be literally performed; substantial performance will not suffice." MHR Capital Partners LP v. Presstek, Inc., 912 N.E.2d 43, 47 (N.Y. 2009). All Plaintiffs have sufficiently pleaded the existence of a contract, and Defendant does not argue otherwise.

### a.  DBKA, Inkwel, ALO, Choi's LLC, and HAWM

DBKA, Inkwel, ALO, and Choi's LLC do not allege that they provided a written notice of dispute to Defendants within 60 days of the charges for which they seek recovery, nor do they allege timely telephonic notice of dispute with regard to the annual fee. These Plaintiffs thus fail to plead "performance by the party seeking recovery" RCN Telecon, 156 F. App'x at 341, and the court dismisses their claims for breach of contract.

HAWM likewise fails to plead performance. While HAWM alleges to have complained in writing about Defendant's practices to "several federal and state authorities and the Better Business Bureau" (CCAC ¶ 117) and that "[s]everal of these writings . . . were served on Defendant within 60 days" (id. ¶ 118), it does not allege that it notified Defendant directly and in writing, as required by the Merchant Agreement. Such allegations of actual notice are insufficient under New York law. See Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York, 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) (under New York law, "[a]ctual notice or substantial compliance [with a notice-of-dispute provision] does not suffice"). Consequently, the court dismisses HAWM's breach of contract claim.

### b.  ASBC

ASBC, however, alleges that it: (1) provided written notice of dispute to Defendant on May 3, 2013 and March 29, 2016 seeking a refund of charges stemming from improper routing of transactions to non-qualified tiers within the preceding 60 days (CCAC ¶¶ 163, 193); and (2)

27

provided telephonic notice of dispute concerning the annual fee in October 2013, November 2014, and November 2015, in all instances within 60 days of the fee having been assessed (id. ¶¶ 182-185). This is sufficient to discharge ASBC's notice obligations under the Merchant Agreement.

ASBC's claim that Defendant improperly routed transactions to higher-priced tiers in violation of the Merchant Agreement, however, is precluded by Plaintiffs' allegation that card networks (e.g. Visa, Mastercard) themselves establish interchange fees, and that Defendant has no ability to influence the tier to which a given transaction is routed. (See id. ¶ 9.) While Plaintiffs argue in their opposition to this motion that, in fact, it is the card processors who set these fees, "[i]t is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs." Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) (collecting cases). Because Plaintiffs' own pleading indicates that Defendant cannot have breached the agreement in the manner alleged, the court dismisses ASBC's breach claim insofar as premised on allegedly improper routing of transactions.

Plaintiffs' allegations that the annual fee was not assessed in accordance with the Merchant Agreement, however, state a plausible breach attributable to Defendant. While the Merchant Agreement accords Defendant discretion to charge an annual fee "to defray the cost of necessary systems technology upgrades, communication requirements and reporting" (e.g., ASBC Appl. at ECF p. 4), Plaintiffs' allegations that the fee was charged at the same time, in the same amount, year after year are more than adequate to support the inference that Defendant assessed the fee as a matter of course and solely for the purpose of padding its bottom line, in violation of the terms of the Merchant Agreement. (See CCAC ¶¶ 170-171, 222-225.)

ASBC, having paid and timely disputed the allegedly wrongful annual fee, may proceed with its breach claim if it has plausibly alleged damages flowing therefrom. While ASBC alleges to have paid the annual fee in each of the years from 2013-2015, it also sought and obtained a full refund of the 2015 fee. (CCAC ¶¶ 182-185.) Because the complaint does not allege any other compensable damages ASBC suffered as a result of Defendant's assessment of the 2015 annual fee upon it, the fact that this fee was refunded in full precludes any further recovery. Cf. Mariah Re Ltd. v. Am. Family Mut. Ins. Co., 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014) (under New York law, " [i]n the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint" (citation and internal quotation marks omitted)). Because, however, ASBC obtained no refund of the 2013 annual fee and only a partial refund of the 2014 annual fee, it may proceed with its breach claim as to the annual fee assessed in these years.

 3.    Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs also assert that, to the extent Defendant's various alleged misdeeds did not actually breach the terms of the Merchant Agreement, these acts nonetheless breached the implied covenant of good faith and fair dealing. (CCAC ¶¶ 261-270.) These claims are duplicative of Plaintiffs' direct breach claims and are therefore dismissed.

New York law implies an obligation into every contract that "[n]either party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Spinelli v. Nat'l Football League, 903 F.3d 185, 206 (2d Cir. 2018) (citation omitted) (alteration adopted). However, "[t]he implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (citation and internal quotation

marks omitted). Moreover, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).

Here, Plaintiffs' "claim[s] for breach of the implied covenant seek[] redress for the same conduct and resulting injury as the breach of contract claim[s]—namely, the recovery of damages incurred as a result of [Defendant's] charging unwanted fees," Zam & Zam, 736 F. App'x at 278. While Plaintiffs are correct that New York law does, under certain circumstances, permit an implied covenant claim to be to be pleaded in the alternative, this has typically been applied only in situations where "there is a dispute over the meaning of the contract's express terms." Spinelli, 903 F.3d at 206; see also Gravier Prods., Inc. v. Amazon Content Servs., LLC, 19-cv-1169 (DLC), 2019 WL 3456633, at *4 (S.D.N.Y. July 31, 2019). No such dispute exists in this case and, for that reason, Plaintiffs' implied covenant claims are duplicative of Plaintiffs' direct breach claims. Accordingly, these claims are dismissed.

### E. Jury Demand

The Program Guide contains a provision "irrevocably waiv[ing] any and all rights [any party thereto] may have to a trial by jury in any judicial proceeding involving any claim relating to or arising under [the Merchant Agreement]." (Guide § 31.3.) On this basis, Defendant moves this court to strike the jury demand contained in the CCAC. (See Mem. at 33.)

"When asserted in federal court, the right to a jury trial is governed by federal law . . . [and] a contractual waiver [of that right] is enforceable if it is made knowingly, intentionally, and voluntarily." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 188 (2d Cir. 2007) (citations omitted). Plaintiffs urge this court to deny Defendant's motion to strike based on

allegations of fraud in the contracting process (Opp. at 35), but this contention is mooted by the court's dismissal of Plaintiffs' fraudulent inducement claims. Consequently, Defendant's motion to strike the jury demand is granted.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's (Dkt. 27) motion to dismiss the Amended Consolidated Class Action Complaint (Dkt. 35) is GRANTED IN PART and DENIED IN PART. The motion is granted as to: (1) all Plaintiffs' fraudulent inducement claims; (2) Plaintiffs Healing the Abused Woman Ministries; Anita's Skin & Body Care; Choi's Beer Shop, LLC; and Abramoff Law Offices' unjust enrichment claims; (3) all Plaintiffs' conversion claims; (4) Plaintiffs Healing the Abused Woman Ministries; Kelwin Inkwel, LLC; D.B. Kosie & Associates; Choi's Beer Shop, LLC; and Abramoff Law Offices' breach of contract claims; and (5) all Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing. The motion is denied as to: (1) Plaintiffs Kelwin Inkwel, LLC and DB Kosie & Associates' unjust enrichment claims; and (2) Plaintiff Anita's Skin & Body Care's breach of contract claim.

Further, Defendant's (Dkt. 27) motion to strike the jury demand is GRANTED.

The Clerk of Court is respectfully DIRECTED to terminate Plaintiffs Healing for the Abused Woman Ministries; Choi's Beer Shop, LLC; and Abramoff Law Offices.

The remaining parties are DIRECTED to contact Magistrate Judge Cheryl L. Pollack concerning the next steps in this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      October _8_, 2019

NICHOLAS G. GARAUFIS
United States District Judge